Chief Justice ROBERTS delivered the opinion of the Court.
*111 Petitioners, a group of Nigerian nationals residing in the United States, filed suit in federal court against certain *112 Dutch, British, and Nigerian corporations. Petitioners sued under the Alien Tort Statute, 28 U.S.C. § 1350, alleging that the corporations aided and abetted the Nigerian Government in committing violations of the law of nations in Nigeria. The question presented is whether and under what circumstances *113 courts may recognize a cause of action under the Alien Tort Statute, for violations of the law of nations occurring within the territory of a sovereign other than the United States.
I
Petitioners were residents of Ogoniland, an area of 250 square miles located in the Niger delta area of Nigeria and populated by roughly half a million people. When the complaint was filed, respondents Royal Dutch Petroleum Company and Shell Transport and Trading Company, p.l.c., were holding companies incorporated in the Netherlands and England, respectively. Their joint subsidiary, respondent Shell Petroleum Development Company of Nigeria, Ltd. (SPDC), was incorporated in Nigeria, and engaged in oil exploration and production in Ogoniland. According to the complaint, after concerned residents of Ogoniland began protesting the environmental effects of SPDC's practices, respondents enlisted the Nigerian Government to violently suppress the burgeoning demonstrations. Throughout the early 1990's, the complaint alleges, Nigerian military and police forces attacked Ogoni villages, beating, raping, killing, and arresting residents and destroying or looting property. Petitioners further allege that respondents aided and abetted these atrocities by, among other things, providing the *1663 Nigerian forces with food, transportation, and compensation, as well as by allowing the Nigerian military to use respondents' property as a staging ground for attacks.
Following the alleged atrocities, petitioners moved to the United States where they have been granted political asylum and now reside as legal residents. See Supp. Brief for Petitioners 3, and n. 2. They filed suit in the United States District Court for the Southern District of New York, alleging jurisdiction under the Alien Tort Statute and requesting relief under customary international law. The ATS provides, in full, that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed *114 in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. According to petitioners, respondents violated the law of nations by aiding and abetting the Nigerian Government in committing (1) extrajudicial killings; (2) crimes against humanity; (3) torture and cruel treatment; (4) arbitrary arrest and detention; (5) violations of the rights to life, liberty, security, and association; (6) forced exile; and (7) property destruction. The District Court dismissed the first, fifth, sixth, and seventh claims, reasoning that the facts alleged to support those claims did not give rise to a violation of the law of nations. The court denied respondents' motion to dismiss with respect to the remaining claims, but certified its order for interlocutory appeal pursuant to § 1292(b).
The Second Circuit dismissed the entire complaint, reasoning that the law of nations does not recognize corporate liability. 621 F.3d 111 (2010). We granted certiorari to consider that question. 565 U.S. ----, 132 S.Ct. 472, 181 L.Ed.2d 292 (2011). After oral argument, we directed the parties to file supplemental briefs addressing an additional question: "Whether and under what circumstances the [ATS] allows courts to recognize a cause of action for violations of the law of nations occurring within the territory of a sovereign other than the United States." 565 U.S. ----, 132 S.Ct. 1738, 182 L.Ed.2d 270 (2012). We heard oral argument again and now affirm the judgment below, based on our answer to the second question.
II
Passed as part of the Judiciary Act of 1789, the ATS was invoked twice in the late 18th century, but then only once more over the next 167 years. Act of Sept. 24, 1789, § 9, 1 Stat. 77; see Moxon v. The Fanny, 17 F. Cas. 942 (No. 9,895) (D.C.Pa.1793) ; Bolchos v. Darrel, 3 F. Cas. 810 (No. 1,607) (D.C.S.C.1795) ; O'Reilly de Camara v. Brooke, 209 U.S. 45, 28 S.Ct. 439, 52 L.Ed. 676 (1908) ; Khedivial Line, S.A.E. v. Seafarers' Int'l Union, 278 F.2d 49, 51-52 (C.A.2 1960) (per curiam ). The statute *115 provides district courts with jurisdiction to hear certain claims, but does not expressly provide any causes of action. We held in Sosa v. Alvarez-Machain, 542 U.S. 692, 714, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004), however, that the First Congress did not intend the provision to be "stillborn." The grant of jurisdiction is instead "best read as having been enacted on the understanding that the common law would provide a cause of action for [a] modest number of international law violations." Id., at 724, 124 S.Ct. 2739. We thus held that federal courts may "recognize private claims [for such violations] under federal common law." Id., at 732, 124 S.Ct. 2739. The Court in Sosa rejected the plaintiff's claim in that case for "arbitrary arrest and detention," on the ground that it failed to state a violation of the law of nations with the requisite "definite content and acceptance among civilized nations." Id., at 699, 732, 124 S.Ct. 2739. *1664 The question here is not whether petitioners have stated a proper claim under the ATS, but whether a claim may reach conduct occurring in the territory of a foreign sovereign. Respondents contend that claims under the ATS do not, relying primarily on a canon of statutory interpretation known as the presumption against extraterritorial application. That canon provides that "[w]hen a statute gives no clear indication of an extraterritorial application, it has none," Morrison v. National Australia Bank Ltd., 561 U.S. 247, ----, 130 S.Ct. 2869, 2878, 177 L.Ed.2d 535 (2010), and reflects the "presumption that United States law governs domestically but does not rule the world," Microsoft Corp. v. AT & T Corp., 550 U.S. 437, 454, 127 S.Ct. 1746, 167 L.Ed.2d 737 (2007).
This presumption "serves to protect against unintended clashes between our laws and those of other nations which could result in international discord." EEOC v. Arabian American Oil Co., 499 U.S. 244, 248, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) (Aramco ). As this Court has explained:
"For us to run interference in ... a delicate field of international relations there must be present the affirmative *116 intention of the Congress clearly expressed. It alone has the facilities necessary to make fairly such an important policy decision where the possibilities of international discord are so evident and retaliative action so certain." Benz v. Compania Naviera Hidalgo, S.A., 353 U.S. 138, 147 [77 S.Ct. 699, 1 L.Ed.2d 709] (1957). The presumption against extraterritorial application helps ensure that the Judiciary does not erroneously adopt an interpretation of U.S. law that carries foreign policy consequences not clearly intended by the political branches.
We typically apply the presumption to discern whether an Act of Congress regulating conduct applies abroad. See, e.g., Aramco, supra, at 246, 111 S.Ct. 1227 ("These cases present the issue whether Title VII applies extraterritorially to regulate the employment practices of United States employers who employ United States citizens abroad"); Morrison, supra, at ----, 130 S.Ct., at 2876-2877 (noting that the question of extraterritorial application was a "merits question," not a question of jurisdiction). The ATS, on the other hand, is "strictly jurisdictional." Sosa, 542 U.S., at 713, 124 S.Ct. 2739. It does not directly regulate conduct or afford relief. It instead allows federal courts to recognize certain causes of action based on sufficiently definite norms of international law. But we think the principles underlying the canon of interpretation similarly constrain courts considering causes of action that may be brought under the ATS.
Indeed, the danger of unwarranted judicial interference in the conduct of foreign policy is magnified in the context of the ATS, because the question is not what Congress has done but instead what courts may do. This Court in Sosa repeatedly stressed the need for judicial caution in considering which claims could be brought under the ATS, in light of foreign policy concerns. As the Court explained, "the potential [foreign policy] implications ... of recognizing.... causes [under the ATS] should make courts particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs." Id., at 727, 124 S.Ct. 2739;
*117 see also id., at 727-728, 124 S.Ct. 2739 ("Since many attempts by federal courts to craft remedies for the violation of new norms of international law would raise risks of adverse foreign policy consequences, they should be undertaken, if at all, with great caution");
*1665 id., at 727, 124 S.Ct. 2739 ("[T]he possible collateral consequences of making international rules privately actionable argue for judicial caution"). These concerns, which are implicated in any case arising under the ATS, are all the more pressing when the question is whether a cause of action under the ATS reaches conduct within the territory of another sovereign.
These concerns are not diminished by the fact that Sosa limited federal courts to recognizing causes of action only for alleged violations of international law norms that are " 'specific, universal, and obligatory.' " Id., at 732, 124 S.Ct. 2739 (quoting In re Estate of Marcos, Human Rights Litigation, 25 F.3d 1467, 1475 (C.A.9 1994) ). As demonstrated by Congress's enactment of the Torture Victim Protection Act of 1991, 106 Stat. 73, note following 28 U.S.C. § 1350, identifying such a norm is only the beginning of defining a cause of action. See id., § 3 (providing detailed definitions for extrajudicial killing and torture); id., § 2 (specifying who may be liable, creating a rule of exhaustion, and establishing a statute of limitations). Each of these decisions carries with it significant foreign policy implications.
The principles underlying the presumption against extraterritoriality thus constrain courts exercising their power under the ATS.
III
Petitioners contend that even if the presumption applies, the text, history, and purposes of the ATS rebut it for causes of action brought under that statute. It is true that Congress, even in a jurisdictional provision, can indicate that it intends federal law to apply to conduct occurring abroad. See, e.g., 18 U.S.C. § 1091(e) (2006 ed., Supp. V) (providing jurisdiction over the offense of genocide "regardless of where *118 the offense is committed" if the alleged offender is, among other things, "present in the United States"). But to rebut the presumption, the ATS would need to evince a "clear indication of extraterritoriality." Morrison, 561 U.S., at ----, 130 S.Ct., at 2883. It does not.
To begin, nothing in the text of the statute suggests that Congress intended causes of action recognized under it to have extraterritorial reach. The ATS covers actions by aliens for violations of the law of nations, but that does not imply extraterritorial reach-such violations affecting aliens can occur either within or outside the United States. Nor does the fact that the text reaches "any civil action" suggest application to torts committed abroad; it is well established that generic terms like "any" or "every" do not rebut the presumption against extraterritoriality. See, e.g., id., at ----, 130 S.Ct., at 2881-2882; Small v. United States, 544 U.S. 385, 388, 125 S.Ct. 1752, 161 L.Ed.2d 651 (2005) ; Aramco, 499 U.S., at 248-250, 111 S.Ct. 1227; Foley Bros., Inc. v. Filardo, 336 U.S. 281, 287, 69 S.Ct. 575, 93 L.Ed. 680 (1949).
Petitioners make much of the fact that the ATS provides jurisdiction over civil actions for "torts" in violation of the law of nations. They claim that in using that word, the First Congress "necessarily meant to provide for jurisdiction over extraterritorial transitory torts that could arise on foreign soil." Supp. Brief for Petitioners 18. For support, they cite the common-law doctrine that allowed courts to assume jurisdiction over such "transitory torts," including actions for personal injury, arising abroad. See Mostyn v. Fabrigas, 1 Cowp. 161, 177, 98 Eng. Rep. 1021, 1030 (1774) (Mansfield, L.) ("[A]ll actions of a transitory nature that arise abroad may be laid as happening in an English county"); Dennick v. Railroad Co., 103 U.S. 11, 18, 26 L.Ed. 439 (1881)
*1666 ("Wherever, by either the common law or the statute law of a State, a right of action has become fixed and a legal liability incurred, that liability may be enforced and the right of action pursued in any court which has jurisdiction of such matters and can obtain jurisdiction of the parties").
*119 Under the transitory torts doctrine, however, "the only justification for allowing a party to recover when the cause of action arose in another civilized jurisdiction is a well founded belief that it was a cause of action in that place." Cuba R. Co. v. Crosby, 222 U.S. 473, 479, 32 S.Ct. 132, 56 L.Ed. 274 (1912) (majority opinion of Holmes, J.). The question under Sosa is not whether a federal court has jurisdiction to entertain a cause of action provided by foreign or even international law. The question is instead whether the court has authority to recognize a cause of action under U.S. law to enforce a norm of international law. The reference to "tort" does not demonstrate that the First Congress "necessarily meant" for those causes of action to reach conduct in the territory of a foreign sovereign. In the end, nothing in the text of the ATS evinces the requisite clear indication of extraterritoriality.
Nor does the historical background against which the ATS was enacted overcome the presumption against application to conduct in the territory of another sovereign. See Morrison,supra, at ----, 130 S.Ct., at 2883 (noting that "[a]ssuredly context can be consulted" in determining whether a cause of action applies abroad). We explained in Sosa that when Congress passed the ATS, "three principal offenses against the law of nations" had been identified by Blackstone: violation of safe conducts, infringement of the rights of ambassadors, and piracy. 542 U.S., at 723, 724, 124 S.Ct. 2739; see 4 W. Blackstone, Commentaries on the Laws of England 68 (1769). The first two offenses have no necessary extraterritorial application. Indeed, Blackstone-in describing them-did so in terms of conduct occurring within the forum nation. See ibid. (describing the right of safe conducts for those "who are here"); 1 id., at 251 (1765) (explaining that safe conducts grant a member of one society "a right to intrude into another"); id., at 245-248 (recognizing the king's power to "receiv[e] ambassadors at home" and detailing their rights in the state "wherein they are appointed to reside"); see also E. De Vattel, Law of Nations 465 (J. Chitty et al. transl. and ed. 1883) ("[O]n his entering *120 the country to which he is sent, and making himself known, [the ambassador] is under the protection of the law of nations ...").
Two notorious episodes involving violations of the law of nations occurred in the United States shortly before passage of the ATS. Each concerned the rights of ambassadors, and each involved conduct within the Union. In 1784, a French adventurer verbally and physically assaulted Francis Barbe Marbois-the Secretary of the French Legion-in Philadelphia. The assault led the French Minister Plenipotentiary to lodge a formal protest with the Continental Congress and threaten to leave the country unless an adequate remedy were provided. Respublica v. De Longchamps, 1 Dall. 111, 1 L.Ed. 59 (O.T.Phila.1784) ; Sosa, supra, at 716-717, and n. 11, 124 S.Ct. 2739. And in 1787, a New York constable entered the Dutch Ambassador's house and arrested one of his domestic servants. See Casto, The Federal Courts' Protective Jurisdiction over Torts Committed in Violation of the Law of Nations, 18 Conn. L.Rev. 467, 494 (1986). At the request of Secretary of Foreign Affairs John Jay, the Mayor of New York City arrested the constable in turn, but cautioned that because " 'neither Congress nor our [State] Legislature have *1667 yet passed any act respecting a breach of the privileges of Ambassadors,' " the extent of any available relief would depend on the common law. See Bradley, The Alien Tort Statute and Article III, 42 Va. J. Int'l L. 587, 641-642 (2002) (quoting 3 Dept. of State, The Diplomatic Correspondence of the United States of America 447 (1837)). The two cases in which the ATS was invoked shortly after its passage also concerned conduct within the territory of the United States. See Bolchos, 3 F. Cas. 810 (wrongful seizure of slaves from a vessel while in port in the United States); Moxon, 17 F. Cas. 942 (wrongful seizure in United States territorial waters).
These prominent contemporary examples-immediately before and after passage of the ATS-provide no support for the proposition that Congress expected causes of action to be *121 brought under the statute for violations of the law of nations occurring abroad.
The third example of a violation of the law of nations familiar to the Congress that enacted the ATS was piracy. Piracy typically occurs on the high seas, beyond the territorial jurisdiction of the United States or any other country. See 4 Blackstone, supra, at 72 ("The offence of piracy, by common law, consists of committing those acts of robbery and depredation upon the high seas, which, if committed upon land, would have amounted to felony there"). This Court has generally treated the high seas the same as foreign soil for purposes of the presumption against extraterritorial application. See, e.g., Sale v. Haitian Centers Council, Inc., 509 U.S. 155, 173-174, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993) (declining to apply a provision of the Immigration and Nationality Act to conduct occurring on the high seas); Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 440, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989) (declining to apply a provision of the Foreign Sovereign Immunities Act of 1976 to the high seas). Petitioners contend that because Congress surely intended the ATS to provide jurisdiction for actions against pirates, it necessarily anticipated the statute would apply to conduct occurring abroad.
Applying U.S. law to pirates, however, does not typically impose the sovereign will of the United States onto conduct occurring within the territorial jurisdiction of another sovereign, and therefore carries less direct foreign policy consequences. Pirates were fair game wherever found, by any nation, because they generally did not operate within any jurisdiction. See 4 Blackstone, supra, at 71. We do not think that the existence of a cause of action against them is a sufficient basis for concluding that other causes of action under the ATS reach conduct that does occur within the territory of another sovereign; pirates may well be a category unto themselves. See Morrison, 561 U.S., at ----, 130 S.Ct., at 2883 ("[W]hen a statute provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that *122 provision to its terms"); see also Microsoft Corp., 550 U.S., at 455-456, 127 S.Ct. 1746.
Petitioners also point to a 1795 opinion authored by Attorney General William Bradford. See Breach of Neutrality, 1 Op. Atty. Gen. 57. In 1794, in the midst of war between France and Great Britain, and notwithstanding the American official policy of neutrality, several U.S. citizens joined a French privateer fleet and attacked and plundered the British colony of Sierra Leone. In response to a protest from the British Ambassador, Attorney General Bradford responded as follows:
So far ... as the transactions complained of originated or took place in a foreign country, they are not within the cognizance of our courts; nor can the *1668 actors be legally prosecuted or punished for them by the United States. But crimes committed on the high seas are within the jurisdiction of the ... courts of the United States; and, so far as the offence was committed thereon, I am inclined to think that it may be legally prosecuted in ... those courts.... But some doubt rests on this point, in consequence of the terms in which the [applicable criminal law] is expressed. But there can be no doubt that the company or individuals who have been injured by these acts of hostility have a remedy by a civil suit in the courts of the United States; jurisdiction being expressly given to these courts in all cases where an alien sues for a tort only, in violation of the laws of nations, or a treaty of the United States...." Id., at 58-59.
Petitioners read the last sentence as confirming that "the Founding generation understood the ATS to apply to law of nations violations committed on the territory of a foreign sovereign." Supp. Brief for Petitioners 33. Respondents counter that when Attorney General Bradford referred to "these acts of hostility," he meant the acts only insofar as *123 they took place on the high seas, and even if his conclusion were broader, it was only because the applicable treaty had extraterritorial reach. See Supp. Brief for Respondents 28-30. The Solicitor General, having once read the opinion to stand for the proposition that an "ATS suit could be brought against American citizens for breaching neutrality with Britain only if acts did not take place in a foreign country," Supp. Brief for United States as Amicus Curiae 8, n. 1 (internal quotation marks and brackets omitted), now suggests the opinion "could have been meant to encompass ... conduct [occurring within the foreign territory]," id., at 8.
Attorney General Bradford's opinion defies a definitive reading and we need not adopt one here. Whatever its precise meaning, it deals with U.S. citizens who, by participating in an attack taking place both on the high seas and on a foreign shore, violated a treaty between the United States and Great Britain. The opinion hardly suffices to counter the weighty concerns underlying the presumption against extraterritoriality.
Finally, there is no indication that the ATS was passed to make the United States a uniquely hospitable forum for the enforcement of international norms. As Justice Story put it, "No nation has ever yet pretended to be the custos morum of the whole world...." United States v. The La Jeune Eugenie, 26 F. Cas. 832, 847 (No. 15,551) (C.C.Mass.1822). It is implausible to suppose that the First Congress wanted their fledgling Republic-struggling to receive international recognition-to be the first. Indeed, the parties offer no evidence that any nation, meek or mighty, presumed to do such a thing.
The United States was, however, embarrassed by its potential inability to provide judicial relief to foreign officials injured in the United States. Bradley, 42 Va. J. Int'l L., at 641. Such offenses against ambassadors violated the law of nations, "and if not adequately redressed could rise to an issue of war." Sosa, 542 U.S., at 715, 124 S.Ct. 2739; cf. The Federalist *124 No. 80, p. 536 (J. Cooke ed. 1961) (A. Hamilton) ("As the denial or perversion of justice ... is with reason classed among the just causes of war, it will follow that the federal judiciary ought to have cognizance of all causes in which the citizens of other countries are concerned"). The ATS ensured that the United States could provide a forum for adjudicating such incidents. See Sosa, supra, at 715-718, and n. 11, 124 S.Ct. 2739. Nothing about this historical context suggests that Congress also intended federal common law under the ATS *1669 to provide a cause of action for conduct occurring in the territory of another sovereign.
Indeed, far from avoiding diplomatic strife, providing such a cause of action could have generated it. Recent experience bears this out. See Doe v. Exxon Mobil Corp., 654 F.3d 11, 77-78 (C.A.D.C.2011) (Kavanaugh, J., dissenting in part) (listing recent objections to extraterritorial applications of the ATS by Canada, Germany, Indonesia, Papua New Guinea, South Africa, Switzerland, and the United Kingdom). Moreover, accepting petitioners' view would imply that other nations, also applying the law of nations, could hale our citizens into their courts for alleged violations of the law of nations occurring in the United States, or anywhere else in the world. The presumption against extraterritoriality guards against our courts triggering such serious foreign policy consequences, and instead defers such decisions, quite appropriately, to the political branches.
We therefore conclude that the presumption against extraterritoriality applies to claims under the ATS, and that nothing in the statute rebuts that presumption. "[T]here is no clear indication of extraterritoriality here," Morrison, 561 U.S., at ----, 130 S.Ct., at 2883, and petitioners' case seeking relief for violations of the law of nations occurring outside the United States is barred.
IV
On these facts, all the relevant conduct took place outside the United States. And even where the claims touch and *125 concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritorial application. See Morrison, 561 U.S. 247, 130 S.Ct., at 2883-2888. Corporations are often present in many countries, and it would reach too far to say that mere corporate presence suffices. If Congress were to determine otherwise, a statute more specific than the ATS would be required.
The judgment of the Court of Appeals is affirmed.
It is so ordered.