In the

# United States Court of Appeals
## For the Seventh Circuit

No. 13-2316

SIKHS FOR JUSTICE, *et al.*,

*Plaintiffs-Appellants*,

*v.*

PARKASH SINGH BADAL,

*Defendant-Appellee*.

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:12-cv-00806-LA — **Lynn Adelman**, *Judge*.

ARGUED NOVEMBER 8, 2013 — DECIDED NOVEMBER 26, 2013

Before POSNER, ROVNER, and WILLIAMS, *Circuit Judges*.

POSNER, *Circuit Judge*. This appeal presents a single issue, which is whether the defendant was served with process; yet the case could be the basis for a novel of international intrigue.

Sikhism is an Indian religion. Most Sikhs live in the northwestern Indian state of Punjab. The state's highest official is its Chief Minister. Parkash Singh Badal, the defendant

in this case—a Sikh of course (all male Sikhs have "singh," a derivative of "simha," the Sanskrit word for lion, as part of their names)—is that official, despite his advanced age (85). He has held the office intermittently since 1970 and continuously since 2007.

Sikhs for Justice (SFJ), a U.S.-based human rights group, see www.sikhsforjustice.org/?q=content/about-us (the websites cited in this opinion were visited on November 25, 2013), accuse Badal of being responsible for overseeing police and other security personnel implicated in extrajudicial killings and torture in Punjab, in violation of customary international law and the Torture Victim Protection Act of 1991, 28 U.S.C. § 1350 note, P.L. 102-256, 106 Stat. 73 (1992). Joined by several persons who claim to have been torture victims, SFJ filed this class action suit last year in the federal district court in Milwaukee. The complaint based federal subject-matter jurisdiction on the Alien Tort Statute, 28 U.S.C. § 1350, which confers jurisdiction over "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." Whether that jurisdiction extends to a tort committed by a foreign official in a foreign country is doubtful in light of the Supreme Court's recent decision in *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1669 (2013), but the issue has not been briefed and need not be decided if the district judge was right to dismiss the suit (as he did after an evidentiary hearing and some post-hearing discovery) on the ground that the defendant had not been served with the complaint and as a result the district court had not acquired personal jurisdiction. See *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583–85 (1999). The plaintiffs contend in their appeal that the defendant *was* served, or alternatively that the district judge, by

arbitrarily refusing to give them more time to gather evidence of service, improperly prevented them from proving that he was served.

Through news reports the plaintiffs had learned that the defendant was coming from India to Milwaukee to attend a wedding. He arrived in the United States on August 7. The suit was filed the next day. Now it happened that six people had been killed in an attack on a Sikh temple in Wisconsin two days earlier, and a commemorative meeting had been hurriedly scheduled to take place at a high school in a Milwaukee suburb for the late afternoon of the ninth. The plaintiffs hoped and expected that the defendant would attend the event, and so they hired a process server, Christopher Kratochvil, to serve the defendant during it. They gave him a photograph of the defendant to help Kratochvil identify him, and Kratochvil also watched a video of the defendant. The photograph and the video showed a tall, thin, elderly man with a long white beard and a mustache, wearing a turban (mandatory for Sikh men) and eyeglasses.

Such a man was indeed present at the high school event, standing at the front of the room in which the meeting was about to begin. Kratochvil walked up to him, said, "Excuse me, Mr. Singh Badal," handed him the summons and complaint, and hurried from the room without waiting for a response. According to Kratochvil the time was 4:50 p.m.

The defendant argues that he was never served during his visit to the United States; that he had not been at the high school on August 9 (he was there on August 10 for a larger event, related to the attack on the Sikhs, with Attorney General Holder); that the supposed service of him was a case of mistaken identity. He presented evidence in the district

court proceeding that the person who had been served was another tall, thin, elderly Sikh, an American citizen named Surinderpal Singh Kalra. Fluent in both English and Punjabi, Kalra was at the high school event on August 9 as an interpreter. He was sporting eyeglasses, a turban, a long white beard, and a mustache. He testified that he had received the service papers intended for the defendant while standing at the front of the room waiting for the meeting to begin, but that he hadn't understood their significance. He further testified that he had lost track of the papers and thought he'd simply left them on a table in the high school, and later forgot about them altogether—but, later still, had discovered them in the trunk of his car shortly before the evidentiary hearing in this case. He had been named as a witness, the defendant's lawyers having discovered that he might have been handed the service papers by the process server, by mistake.

The hearing took place in February 2013, some six months after the event at the high school. Kalra brought the service papers with him to the hearing. That was some evidence in support of the defendant's argument that the supposed service on him was a case of mistaken identity, and he presented more evidence of that. He had had a security detail, supplied by the State Department, during his visit to the United States. Members of the detail testified that they'd stuck close to him and no process server had approached him. The security detail had kept a running account of his every move on his visit to Milwaukee; and not only was there no mention of a visit to the high school but there was a notation that Badal had arrived at Milwaukee's Boelter SuperStore (a fancy store selling China tableware and restaurant equipment, see "Boelter SuperStore,"

http://boeltersuperstore.com) at 4:49 p.m., one minute before Kratochvil allegedly served him, and had left the store at 5:09 p.m. after ordering some $1,000 worth of equipment. The store is 17 miles from the high school.

Other witnesses testified to meeting the defendant on April 9 at times that made it impossible for him to have been at the high school at 4:50 p.m. The plaintiffs do not argue that the man identified at the Boelter SuperStore as the defendant was a "body double" meant to fool people into thinking the defendant was there when actually he was at the high school. No one who had been at the high school event (attended by about 60 persons) testified to having seen the defendant there—except Kratochvil, the process server. He testified that the defendant was indeed the person whom he had served, as did his brother, who was with him and is also a process server though he didn't participate in serving the man who Kratochvil insists was the defendant. A Justice Department handout listing the dignitaries who would participate in the event at the high school did not mention the defendant. The district judge adjudged the defendant's witnesses "uniformly credible," and an inference of credibility drawn by a judge from live testimony is entitled to considerable deference by an appellate court.

True, the rule in the federal courts is that a process server's affidavit of service is entitled to a presumption of correctness that can be overcome only by "strong and convincing" evidence. E.g., *Relational, LLC v. Hodges*, 627 F.3d 668, 672 (7th Cir. 2010); *O'Brien v. R.J. O'Brien & Associates, Inc.*, 998 F.2d 1394, 1398 (7th Cir. 1993); *SEC v. Internet Solutions for Business Inc.*, 509 F.3d 1161, 1166 (9th Cir. 2007). That seems an odd rule—a holdover from the era in which only

U.S. marshals could serve process in federal cases, see *O'Brien v. R.J. O'Brien & Associates, Inc.*, *supra*, 998 F.2d at 1398 n. 2 (now anyone who is at least 18 years old can, see Fed. R. Civ. P. 4(c)(2))—given how easy it must be for process servers to make mistakes. Cf. Note, "*Kleeman v. Rheingold*: There Are No Small Mistakes—A Process Server's Negligence Leads to the Creation of a Nondelegable Duty," 15 *Pace L. Rev.* 871 (1995). A process server doesn't want to linger in the presence of the person served, lest that person tear up the papers in the process server's face or even punch him in the nose. Recall how Kratochvil fled after handing Kalra (if it was indeed Kalra) the summons, without waiting for him even to acknowledge the name—for Kratochvil had addressed him by the defendant's name, or rather the last two-thirds of the name.

But this is not the right case in which to reconsider the rule requiring strong and convincing evidence (presumably this formula has the same meaning as the more common "clear and convincing" evidence) to refute a process server's identification. For the district judge recited and applied the rule, yet still found that Kalra, not the defendant, had been served. What makes the judge's finding especially convincing is Kalra's resemblance to the defendant, as seen in the photographs in the appendix to this opinion. Not that the two men would be likely to be confused if they were standing side by side. They are not identical twins. Badal is 2 or 3 inches taller than Kalra, somewhat heavier looking, and about 15 years older than Kalra.

Kratochvil met Kalra just before Kalra's deposition and swore that Kalra wasn't the man he'd served. But Kratochvil had never seen the two together. Even eyewitness identifica-

tion, we now know, is highly fallible. See, e.g., Elizabeth F. Loftus et al., *Eyewitness Testimony: Civil and Criminal* (4th ed. 2007); *United States v. Ford*, 683 F.3d 761, 764–66 (7th Cir. 2012). Attempting to identify a person from a photo (as in a photo lineup) or brief video may be an even more common source of error. "Even with high quality video, matching to photographs is surprisingly error-prone." Peter J.B. Hancock, Vicki Bruce & A. Mike Burton, "Recognition of Unfamiliar Faces," 4 *Trends in Cognitive Sciences* 330, 334 (2000). One reason that is germane to this case is that when we look at a person we tend to focus unconsciously on the "outer features" of his face, such as hairstyle, Stephen C. Want et al., "Recognizing People From the Inner or Outer Parts of Their Faces: Developmental Data Concerning 'Unfamiliar' Faces," 21 *British J. Developmental Psych.*, 125, 133 (2003)—or, one imagines, a turban—rather than giving equal weight to everything we see in the face.

A related point is that people of one race sometimes have difficulty perceiving facial differences in people of a different race, David J. Kelly et al., "The Other-Race Effect Develops During Infancy: Evidence of Perceptual Narrowing," 18 *Psychological Sci.* 1084, 1084 (2007); Christian A. Meissner & John C. Brigham, "Thirty Years of Investigating the Own-Race Bias in Memory for Faces: A Meta-Analytic Review," 7 *Psychology, Public Policy & Law* 3, 5 (2001), or, we imagine, of a distinctive ethnicity visible in their appearance. Kratochvil is not an Indian, and not a Sikh. To the non-Sikh the salient features of a Sikh man are abundant facial hair and a turban. If the man is elderly, the beard will be white. The photo that Kratochvil was carrying to enable him to spot the defendant showed an elderly man with a long white beard and a turban. Kratochvil had been told that the man in the photo

would be at the high school, presumably in a place of prominence since the defendant is a very prominent Sikh (even if hated by the SFJ)—and bingo, at the head of the room Kratochvil sees a man who closely resembles the man in the photo. And of course one does not expect a photo to look *exactly* the same as the subject in the flesh. So Kratochvil makes a beeline for him, hands him the papers, and flees before the man has a chance to ask him what is this all about and to tell him that by the way his name is not Badal.

The plaintiffs point out that the defendant had not appeared at the evidentiary hearing (he was back in India by then) or even submitted an affidavit denying having been served; and that before the hearing, instead of placing Kalra in a witness room in the federal court all by himself, the defendant's lawyer had placed him in a room in a nearby hotel together with members of the defendant's entourage. The plaintiffs argue that the purpose was to intimidate Kalra, hand him the service papers (for it is the plaintiffs' belief that it was the defendant who had been served, that he had taken the service papers back with him to India after his brief visit to the United States and had then sent the papers back to the United States to be given to Kalra, which is how Kalra wound up possessing them), and induce him by means of threats to testify that it was he rather than the defendant who had been served. Probably it would have taken threats to get Kalra to testify in support of the defendant, for he has spoken in public of his support for Sikhs for Justice. Although the plaintiffs argue that he might fear retaliation against his family in India if he crossed Badal, he testified at his deposition that he no longer has any family in India.

Kalra had brought the service papers with him to the hearing—he had been served with them and they were therefore in his possession—but he had also shown them to the defendant's lawyers the day before. That could not be construed as service on the defendant. If handing service papers to a lawyer counted as serving them on his client, a suit could never be dismissed for lack of service—as soon as the defendant's lawyer filed the motion to dismiss for want of service the plaintiff would serve the lawyer. And if service on Badal's lawyer were construed as service on Badal, it would be invalid because untimely. It took place more than 120 days after the suit had been filed, Fed. R. Civ. P. 4(m), for the plaintiffs never requested, let alone received, an extension of the time within which they had to serve the defendant. Nor did they attempt to serve him in India, as they might have been able to do under the Hague Service Convention, see Fed. R. Civ. P. 4(f); Status Table, Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, *Hague Conference on Private International Law*, www.hcch.net/index_en.php?act=conventions.status&cid=17—and may now be attempting to do. See Bruce Vielmetti, "Sikhs Up Reward to $20,000 to Serve Lawsuit; Defendant Punjab Official Skips Milwaukee Visit," *Milwaukee Journal Sentinel*, July 12, 2013, www.jsonline.com/blogs/news/215110631.html.

There is no evidence to support the plaintiffs' accusation of perjury and obstruction of justice. It would make a good tale of international intrigue, but is too unsubstantiated and implausible to counter the abundant evidence that the defendant was never at the high school on August 9 and therefore was never served; for there is no suggestion that service was attempted on him at any other time or place. We add

that it seems extremely unlikely that a high official of a nation friendly to the United States would attempt to obstruct justice in a U.S. court.

Nor can any weight be given to the fact that the defendant did not return to the United States from India to testify in the district court proceeding, or even submit an affidavit. Had he submitted an affidavit the plaintiffs would have insisted on their right to cross-examine him. And had he returned to Milwaukee to testify or be cross-examined he would have been dignifying a suit accusing him of crimes against humanity, and such a suit might have undermined his high official status in India. And doubtless he would have been served with process in a new suit. SFJ "has offered a $10,000 bonus to whichever of three professional process service firms can successfully serve Badal and his son the new summons and complaint." Bruce Vielmetti, "Sikhs for Justice Offer $10,000 for Anyone Who Can Serve Lawsuit on Indian Official," *Milwaukee Journal Sentinel*, June 28, 2013, www.jsonline.com/blogs/news/213549841.html. Badal and his son (who is also his deputy) were planning a return visit to Milwaukee. But "perhaps fearing aggressive process servers motivated by the large cash bounty, the Badals cancelled their trip." Vielmetti, "Sikhs Up Reward to $20,000 to Serve Lawsuit; Defendant Punjab Official Skips Milwaukee Visit," *supra*. It is noteworthy that the three contestants for the now-$20,000 bounty do not include Kratochvil.

The plaintiffs insinuate that the defendant's State Department security team was complicit in the alleged service fraud, though they do not assign a motive (such as protecting our good relations with India by squelching a lawsuit

against a high Indian official). They point out that the agent
heading the team accosted process server Kratochvil at his
home and badgered him to sign an affidavit stating that if
the defendant had never been at the high school on August
9, then he had not served the defendant. On its face this is
equivalent to saying $2 + 2 = 4$, or saying if this is B, it is not A;
it is the statement of a logical relation, rather than an obser-
vation. But maybe the agent's purpose was to negate any in-
ference that Kratochvil might have served the defendant at
some other time during the latter's visit to Milwaukee. Still,
the agent's demanding an affidavit from Kratochvil was dis-
tinctly odd, as opposed to the defendant's lawyer deposing
him. The government—the agent's employer—wasn't even a
party to the lawsuit. Maybe the agent felt that it would be a
black mark against him if the foreign official whom he was
escorting had been served with a complaint. No matter; the
irregularity of the agent's conduct has no bearing on whom
Kratochvil served.

The plaintiffs complain that they were not given enough
time to prove that the defendant had been served. Remem-
ber that the suit had been filed on August 8, 2012, and ser-
vice attempted the next day. The evidentiary hearing to de-
termine whether the defendant had been served was not
held until February 21, 2013, six and a half months later. So
the plaintiffs had plenty of time in which to conduct discov-
ery. And at the end of the hearing the judge granted the
plaintiffs' request to be allowed another month to conduct
additional discovery. When that month was up they asked
for an additional month, and this time the judge refused
(with the exception of allowing service of an interrogatory
dealing with a peripheral issue).

The plaintiffs are particularly wroth at the judge's refusal to give them more time to depose a man named Harpreet Singh Mokha, a Justice Department employee who—Kalra had testified at his March 11, 2013, deposition—had invited him to interpret at the high school event. The plaintiffs hoped that Mokha would testify that he had been with Kalra during the event and hadn't seen anyone try to serve him. The judge denied the plaintiffs' request to give them more time to explore the matter because "the court has already heard testimony from Kalra himself and there is no reason to believe Mokha would have anything to add." That was not a good ground for denying the plaintiffs' request, given their theory that Kalra was lying about having been served and their contention that they first learned about "the importance of Mr. Mokha" at Kalra's deposition on March 11. The one-month discovery extension previously granted by the district judge expired on March 22. So they had only 11 days in which to arrange for and conduct a deposition of Mokha, and that was not enough time.

But there was a better ground that the judge could have given for his ruling but did not: Kalra had not testified at his deposition that Mokha, or anyone else, was near him when he was served.

Anyway, testimony by Mokha that Kalra had not been the person served, or disbelief in Kalra's testimony that he had been served, could not have helped the plaintiffs' case. Kratochvil was positive that he had served the defendant at the high school commemorative event, and the plaintiffs insist that he was correct. He did not testify that he'd served the defendant somewhere else as well; nor did the plaintiffs present any evidence that the defendant was served some-

where else. It was the high school or nowhere. The plaintiffs do not suggest that Mokha would have testified that he had seen the defendant served, only that he had not seen Kalra served; remember, no credible evidence places the defendant in the high school at 4:50 p.m. Even if Kalra had made up the story about being served, there would still be no evidence that the defendant had been served at the high school or anywhere else.

The plaintiffs also complain that they needed the additional month of discovery to determine whether it was true, as they had just learned from an employee of the Boelter SuperStore, that the store's video surveillance camera, which would have captured the defendant on video had he been there as claimed, had recorded over that day's digital video recording. (Previously they'd been told by the store that its video recording system hadn't been working on the day of the defendant's visit.) But if recorded over, the video recording could cast no light on whether the defendant had been in the store at a time when the plaintiffs claim he was elsewhere. The plaintiffs wanted to question a specialist in information technology about the recording over. But they did not explain to the judge what they thought such a specialist could have contributed. The judge was reluctant to allow the litigation to drag on for the sake of a desperate quest, of indefinite length, for additional evidence.

The plaintiffs also wanted additional time to try to find photos or videos taken at the high school event on August 9 that might prove that the defendant had been there after all. But they had been told months earlier that the defendant denied having attended the event, and they don't explain

why they needed more time to obtain the photographic and video evidence that they hoped would refute the denial.

Another reason they gave for wanting more time for discovery was that they wanted to see the affidavit that Kratochvil had signed. They were told that to obtain the affidavit from the State Department (which had it) they would have to subpoena it. We learned at the oral argument that the plaintiffs had obtained the affidavit. It must not have been very helpful to them, for they don't mention it in their briefs.

Still, since the issue of service was critical to the suit, and an additional thirty days for discovery would not have been a significant delay, it would have been reasonable for the judge to have granted the plaintiffs' request. But his refusal to do so was not reversible error. We are reluctant to become enmeshed in challenges to a district court's management of pretrial discovery—especially a challenge complaining that the district judge imposed deadlines that were too tight; for the greater problem in the management of pretrial discovery is the common failure to impose tight deadlines. And the plaintiffs did drag their feet in the conduct of pretrial discovery. But above all, and with due regard for the possibility that the plaintiffs would have obtained additional evidence had they had an additional month to conduct discovery, the evidence of mistaken identity is compelling—indeed overwhelming. Another 30 days for discovery (the plaintiffs do not argue that the judge should have given them even more time than that) would not have tilted the balance of the evidence in the plaintiffs' favor.

There is a final procedural point to note. Ordinarily a dismissal for want of personal jurisdiction as a result of im-

proper service is without prejudice, leaving the plaintiff free to refile the suit and seek to serve the refiled complaint on the defendant. Yet the plaintiffs' opening brief states, though without elaboration or any citation to the record, that their suit was dismissed with prejudice. The judgment order in this case states: "IT IS ORDERED AND ADJUDGED that this case is DISMISSED." Ordinarily such an order operates as an adjudication on the merits, Fed. R. Civ. P. 41(b), and is therefore with prejudice. But the rule has an exception for a dismissal for "lack of jurisdiction," and this includes a dismissal for lack of personal jurisdiction. See, e.g., *Intera Corp. v. Henderson*, 428 F.3d 605, 620–21 (6th Cir. 2005). For without personal jurisdiction, a court has no authority to adjudicate a case on the merits. Probably, therefore, the statement in the brief is a mistake. But that's something to be considered if and when the plaintiffs refile the suit.

AFFIRMED.

APPENDIX: PHOTOGRAPHS OF BADAL AND KALRA



Parkash Singh Badal



Surinderpal Singh Kalra