MARTIN, Circuit Judge,
dissenting:
I respectfully dissent. Last year, in Kiobel v. Royal Dutch Petroleum Co., — U.S.-, 133 S.Ct. 1659, 185 L.Ed.2d 671 (2013), the Supreme Court gave its most recent guidance in the ongoing struggle to define the contours of the Alien Tort Statute (ATS).[1] In that case, the Supreme Court applied the presumption against extraterritoriality to the ATS claims presented. Id. at 1669. The presumption against extraterritorial application is a canon of statutory interpretation, teaching that a statute which gives no clear indication that it applies extraterritorially, does not. Id. at 1664. Significantly however, the Kiobel court left the door open to the extraterritorial application of the ATS for claims made under the statute which “touch and concern the territory of the United States ... with sufficient force to displace the presumption.” Id. at 1669.
The Kiobel opinion offers little assistance about what kinds of domestic connections would be necessary to overcome the presumption against extraterritoriality. But I see this case as one which does just that, for at least two reasons. First, the primary defendant in this case is Chiquita Brands International (Chiquita), a corporation headquartered and incorporated within the territory of the United States. Second, these plaintiffs are not seeking to hold Chiquita liable for conduct that took place on foreign soil. Rather, they allege that Chiquita participated in a campaign of torture and murder in Colombia by reviewing, approving, and concealing a scheme of payments and weapons shipments to Colombian terrorist organizations, all from their corporate offices in the territory of the United States.[2] For these reasons, I believe that we have jurisdiction to consider the plaintiffs’ claims.
I.
First, the plaintiffs’ claims “touch and concern” the territory of the United States because they allege violations of international law by an American national. Quite different from Kiobel, the plaintiffs in this case do not rely on Chiquita’s “mere corporate presence” in the United States to justify ATS jurisdiction. Id. Chiquita is incorporated in New Jersey and headquartered in Ohio. Principles of international law as well as historical materials tell us why this is a crucial difference and is ultimately dispositive of the case we consider here. Indeed, I am persuaded that the ATS was intended to provide a remedy for extraterritorial violations of the law of nations like those alleged to have been committed here by United States nationals like Chiquita.
*1193 To begin with, it is a fundamental principle of international law that every State has the sovereign authority to- regulate the conduct of its own citizens, regardless of whether that conduct occurs inside or outside of the State’s territory. See Restatement (Third) of The Foreign Relations Law of the United States § 402(2) (1987) (“[A] state has jurisdiction to prescribe law with respect to ... the activities, interests, status, or relations of its nationals outside as well as within its territory.”). This has been true from the beginnings of our union, and at the time the ATS was first enacted. See Rose v. Himely, 8 U.S. (4 Cranch) 241, 279, 2 L.Ed. 608 (1808) (observing that beyond its own territory, the laws of a country “can only affect its own subjects or citizens”); The Apollon, 22 U.S. (9 Wheat.) 362, 370, 6 L.Ed. 111 (1824) (“The laws of no nation can justly extend beyond its own territories, except so far as regards its own citizens.”). In keeping with this fundamental principle, the same foreign governments who urged the Supreme Court to dismiss the claims in Kiobel also acknowledged that an ATS claim would have “a sufficiently close connection” with the United States when the violation of the law of nations was committed by a United States citizen. See Kiobel, Brief for Gov’t of the Kingdom of the Netherlands et al. as Amici Curiae, 14. Indeed, the United Kingdom, the Netherlands, and Switzerland all take a similar approach, disallowing extraterritorial torts except for claims asserted against their own nationals. See id. at 18-23, 21 n. 32.
More fundamentally, the framers of the ATS gave voice to the idea that the United States had not only the authority, but also international legal obligations to provide a forum for aliens to receive compensation for the most egregious offenses committed by Americans in other countries. Speaking on the law of nations, William Blackstone stated that “where the individuals of any state violate this general law, it is then the interest as well as duty of the government under which they live, to animadvert upon them with a becoming severity, that the peace of the world may be maintained.” 4 William Blackstone, Commentaries on the Laws of England 68 (1769); see also Emmerich de Vattel, The Law of Nations or the Principles of Natural Law Applied to the Conduct and to the Affairs of Nations and of Sovereigns, bk. II, ch. VI § 77 (1768) (Charles G. Fenwick trans., 1916) (“A sovereign who refuses to repair the evil done by one of his subjects, or to punish the criminal, or, finally, to deliver him up, makes himself in a way an accessory to the deed, and becomes responsible for it.”). The United States would fail to meet the expectations of the international community were we to allow U.S. citizens to travel to foreign shores and commit violations of the law of nations with impunity. See Filartiga v. Pena-Irala, 630 F.2d 876, 890 (2d Cir.1980) (“[F]or purposes of civil liability, the torturer has become — like the pirate and slave trader before him — hostis humani generis, an enemy of all mankind.”).[3]
*1194 That the framers of the ATS contemplated a remedy for torts committed by American citizens abroad is also supported by an opinion authored by Attorney General William Bradford in 1795. See Breach of Neutrality, 1 Op. Att’y Gen. 57 (1795). In this opinion, Attorney General Bradford was responding to concerns about several United States citizens who “voluntarily joined, conducted, aided, and abetted a French fleet” in attacking the British Colony of Sierra Leone, as well as “plundering or destroying the property of British subjects on that coast.” Id. at 58. Attorney General Bradford had “no doubt” that the victims in Sierra Leone “who have been injured by these acts of hostility have a remedy by a civil suit in the courts of the United States; jurisdiction being expressly given to these courts in all cases when an alien sues for a tort only, in violation of the laws of nations, or a treaty of the United States.” Id. at 59.
I recognize that the Kiobel Court was not persuaded that Attorney General Bradford understood the ATS to apply to every extraterritorial violation of the law of nations, irrespective of the wrongdoer’s nationality. See 133 S.Ct. at 1668. But the Bradford opinion is at least strong evidence that the ATS provides a remedy for extraterritorial violations of the laws of nations committed by United States citizens. Just as the British colonists in Sierra Leone could sue their American attackers in 1795 under the ATS, the Colombian plaintiffs here should be allowed to hold an American corporation liable for its participation in a campaign of torture and extrajudicial killings in Colombia.
II.
Another distinction between Kiobel and the case now before us is the plaintiffs here do not seek to hold Chiquita liable for any of its conduct on foreign soil. See id. Critically, the plaintiffs instead have alleged that Chiquita’s corporate officers reviewed, approved, and concealed payments and weapons transfers to Colombian terrorist organizations from their offices in the United States with the purpose that the terrorists would use them to commit extrajudicial killings and other war crimes.
This is not, therefore, a case where a defendant is being haled into court under the ATS exclusively for actions that took place on foreign soil. See, e.g., Kaplan v. Central Bank of Islamic Rep. of Iran, 961 F.Supp.2d 185, 205 (D.D.C.2013) (dismissing claims under Kiobel because “the attacks were allegedly funded by Iran, launched from Lebanon, and targeted Israel”). Neither is this a case in which plaintiffs are seeking to circumvent the Kiobel presumption by holding an American company vicariously liable for the unauthorized actions of its subsidiaries overseas. See, e.g., Balintulo v. Daimler AG, 727 F.3d 174, 192 (2d Cir.2013) (holding that the Kiobel presumption is not displaced where an American corporation is vicariously liable for actions taken within South Africa by a South African subsidiary). Rather, the plaintiffs seek to hold Chiquita liable for violations of international law it committed within the territory of the United States.
My views are in keeping with a number of trial court and appeals court decisions, post-Kiobel, finding the “touch and concern” test satisfied when a defendant aids and abets overseas torts from within the United States. See Al Shimari v. CACI Premier Tech., Inc., 758 F.3d 516, 530-31, 2014 WL 2922840, at *12 (4th Cir. June 30, 2014) (finding that presumption was displaced in part because CACI’s managers in the United States gave tacit approval to the acts of torture, attempted to cover up the misconduct, and encouraged it); Sexual Minorities Uganda v. Lively, 960 *1195 F.Supp.2d 304, 323-24 (D.Mass.2013) (finding that the presumption was displaced because the defendant was a resident of the United States and provided assistance to an overseas campaign of persecution from the United States); Mwani v. Laden, 947 F.Supp.2d 1, 5 (D.D.C.2013) (holding that a terrorist attack that (1) was plotted in part within the United States, and (2) was directed at a United States Embassy and its employees displaced the presumption); Krishanti v. Rajaratnam, 2014 WL 1669873, at *10 (D.N.J. Apr. 28, 2014) (“The Rajaratnam Defendants focus on the fact that all of the harm to Plaintiffs occurred in Sri Lanka. This argument would hold weight if the Plaintiffs were suing the LTTE for the actions it took in Sri Lanka. However, Plaintiffs are instead suing the Rajaratnam Defendants for their alleged actions that occurred within the United States.”); see also Du Daobin v. Cisco Sys., Inc., 2 F.Supp.3d 717, 728, 2014 WL 769095, at *9 (D.Md. Feb. 24, 2014) (observing that Kiobel may be distinguishable because (1) “Cisco is an American company”; and (2) plaintiffs alleged that Cisco’s actions “took place predominantly, if not entirely, within the United States”). Like these courts, I conclude that the plaintiffs’ claims here sufficiently “touch and concern” the territory of the United States because they allege that Chiquita violated international law from within the United States by offering substantial assistance to a campaign of violence abroad.
III.
In sum, I do not read Kiobel to be an impediment to providing a remedy to civilians harmed by a decades-long campaign of terror they plainly allege to have been sponsored by an American corporation. Again, these plaintiffs do not seek relief for the offenses of a foreign defendant on foreign soil. These plaintiffs seek relief in a United States court for violations of international law committed by United States citizens while on United States soil. Certainly, these extraterritorial claims “touch and concern the territory of the United States” with great force. By failing to enforce the ATS under these circumstances, I fear we disarm innocents against American corporations that engage in human rights violations abroad. I understand the ATS to have been deliberately crafted to avoid this regrettable result.
For these reasons, I respectfully dissent.

. The Alien Tort Statute was "[pjassed as a part of the Judiciary Act of 1789.” Kiobel, 133 S.Ct. at 1663.

. We consider a jurisdictional challenge here. Thus, at this stage of the proceeding, we accept the facts alleged in the plaintiffs’ complaints as true. McElmurray v. Consolidated Gov’t of Augusta-Richmond Cnty., 501 F.3d 1244, 1251 (11th Cir.2007).

. The majority observes that our sister circuits have not unanimously allowed ATS plaintiffs to allege causes of action for extraterritorial torture after the Supreme Court’s decision in Sosa v. Alvarez-Machain, 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004). I do not read the majority opinion as casting doubt on this Court's post-Sosa jurisprudence holding that torture is a proper claim that may be brought under the ATS. See Romero v. Drummond Co., 552 F.3d 1303, 1316 (11th Cir.2008) (explaining that claims of torture or extrajudicial killing can be brought under the ATS or the Torture Act); Aldana v. Del Monte Fresh Produce, N.A., 416 F.3d 1242, 1250 (11th Cir.2005) (“Torture is actionable under the Alien Tort Act, but only if the conduct is committed in violation of the laws of nations.” (quotation marks omitted)).