ORDER
The order filed December 19, 2013, and appearing at 738 F.3d 1048, is withdrawn, Carver v. Lehman, 558 F.3d 869, 878-79 (9th Cir.2009), and is replaced by the opinion filed concurrently with this order. Our prior order may not be cited as precedent to any court. Moreover, with the original order withdrawn, we deem the petition for rehearing and rehearing en banc moot. The parties may file a petition for rehearing and rehearing en bane with respect to the opinion filed together with this order.
IT IS SO ORDERED.
OPINION
D.W. NELSON, Senior Circuit Judge:
The plaintiffs in this case are former child slaves who were forced to harvest cocoa in the Ivory Coast. They filed claims under the Alien Tort Statute (ATS) against defendants Nestle USA, Inc., Archer Daniels Midland Company, Cargill Incorporated Company, and Cargill Cocoa, alleging that the defendants aided and abetted child slavery by providing assistance to Ivorian farmers.
The district court dismissed their complaint, finding that the plaintiffs failed to state a claim upon which relief can be granted. We reverse, vacate, and remand for further proceedings.
I. Background[1]
The use of child slave labor in the Ivory Coast is a humanitarian tragedy. Studies by International Labour Organization, *1017 UNICEF, the Department of State, and numerous other organizations have confirmed that thousands of children are forced to work without pay in the Ivorian economy. Besides the obvious moral implications, this widespread use of child slavery contributes to poverty in the Ivory Coast, degrades its victims by treating them as commodities, and causes long-term mental and physical trauma.
The plaintiffs in this case are three victims of child slavery. They were forced to work on Ivorian cocoa plantations for up to fourteen hours per day six days a week, given only scraps of food to eat, and whipped and beaten by overseers. They were locked in small rooms at night and not permitted to leave the plantations, knowing that children who tried to escape would be beaten or tortured. Plaintiff John Doe II witnessed guards cut open the feet of children who attempted to escape, and John Doe III knew that the guards forced failed escapees to drink urine.
Though tarnished by these atrocities, the Ivory Coast remains a critical part of the international chocolate industry, producing seventy percent of the world’s supply of cocoa. The defendants in this case dominate the Ivorian cocoa market. Although the defendants do not own cocoa farms themselves, they maintain and protect a steady supply of cocoa by forming exclusive buyer/seller relationships with Ivorian farms. The defendants are largely in charge of the work of buying and selling cocoa, and import most of the Ivory Coast’s cocoa harvest into the United States. The defendants’ involvement in the cocoa market gives them economic leverage, and along with other large multinational companies, the defendants effectively control the production of Ivorian cocoa.
To maintain their relationships with Ivorian farms, the defendants offer both financial assistance and technical farming assistance designed to support cocoa agriculture. The financial assistance includes advanced payment for cocoa and spending money for the farmers’ personal use. The technical support includes equipment and training in growing techniques, fermentation techniques, farm maintenance, and appropriate labor practices. The technical support is meant to expand the farms’ capacity and act as a quality control mechanism, and either the defendants or their agents visit farms several times per year as part of the defendants’ training and quality control efforts.
The defendants are well aware of the child slavery problem in the Ivory Coast. They acquired this knowledge firsthand through their numerous visits to Ivorian farms. Additionally, the defendants knew of the child slave labor problems in the Ivorian cocoa sector due to the many reports issued by domestic and international organizations.
Despite their knowledge of child slavery and their control over the cocoa market, the defendants operate in the Ivory Coast “with the unilateral goal of finding the cheapest sources of cocoa.” The defendants continue to supply money, equipment, and training to Ivorian farmers, knowing that these provisions -will facilitate the use of forced child labor. The defendants have also lobbied against congressional efforts to curb the use of child slave labor. In 2001, the House of Representatives passed a bill that would have required United States importers and manufacturers to certify and label their products “slave free.” The defendants and others in the chocolate industry rallied against the bill, urging instead the adoption of a private, voluntary enforcement mechanism. A voluntary enforcement system was eventually adopted, a result that, according to the plaintiffs, “in effect guar *1018 antee[d] the continued use of the cheapest labor available to produce [cocoa] — that of child slaves.”
The plaintiffs filed a proposed class action in the United States District Court for the Central District of California, alleging that the defendants were liable under the ATS for aiding and abetting child slavery in the Ivory Coast. The district court granted the defendants’ motion to dismiss in a detailed opinion, which concluded that corporations cannot be sued under the ATS, and that even if they could, the plaintiffs failed to allege the elements of a claim for aiding and abetting slave labor. The plaintiffs declined to amend their complaint, and appeal the district court’s order.
II. Standard of Review
“A dismissal for failure to state a claim is reviewed de novo. All factual allegations in the complaint are accepted as true, and the pleadings construed in the light most favorable to the nonmoving party.” Abagninin v. AMVAC Chem. Corp., 545 F.3d 733, 737 (9th Cir.2008) (internal citations omitted).
III. Discussion
The ATS, quoted in full, reads:
The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.
28 U.S.C. § 1350. For nearly two hundred years, the ATS was almost never invoked. In Filartiga v. Pena-Irala, however, the Second Circuit breathed life into the statute by construing it to allow two Paraguayan citizens to bring a civil action against a Paraguayan police officer who had tortured and killed their son. 630 F.2d 876, 878 (2d Cir.1980); Sosa v. Alvarez-Machain, 542 U.S. 692, 724-25, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004) (describing Filartiga as “the birth of the modern line of [ATS] cases.”). The Second Circuit in Filartiga reasoned that the ATS was designed to “open[ ] the federal courts for adjudication of the rights already recognized by international law,” and thus permitted the plaintiffs to pursue their tort claim because torture is prohibited by international law. Filartiga, 630 F.2d at 885, 887-88. Filartiga concluded by observing that modern history had led the nations of the world to recognize the collective interest in protecting fundamental human rights, and commented that its holding was “a small but important step in the fulfillment of the ageless dream to free all people from brutal violence.” Id. at 890.
The Supreme Court reached a consonant result in Sosa v. Alvarez-Machain, its first opinion addressing the ATS. The Court first held that the text of the ATS is focused solely on jurisdiction, and that the statute itself does not create a tort cause of action arising out of violations of international law. Sosa, 542 U.S. at 724, 124 S.Ct. 2739. After reviewing the ATS’s history, however, the Court also observed that “the statute was intended to have practical effect the moment it became law,” and thus held that “[t]he jurisdictional grant is best read as having been enacted on the understanding that the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability at the time.” Id. Thus, under Sosa, the federal courts are available to hear tort claims based on violations of international law. Specifically, Sosa held that federal common law creates tort liability for violations of international legal norms, and the ATS in turn provides federal courts with jurisdiction to hear these hybrid common law — international law tort claims. Id.; *1019 Khulumani v. Barclay Nat’l Bank Ltd., 504 F.3d 254, 265 (2d Cir.2007) (Katzmann, J., concurring) (“Sosa makes clear that all [ATS] litigation is in fact based on federal common law... .”).
At the time of its passage, the ATS was intended to grant jurisdiction over tort claims seeking relief only for three violations of international law: piracy, violation of safe conducts, and infringement of the rights of ambassadors. Sosa, 542 U.S. at 724, 124 S.Ct. 2739. The Court in Sosa held, however, that contemporary ATS claims can invoke the rights created by the “present-day law of nations,” and thus are not limited to these “historical paradigms.” Id. at 725, 732, 124 S.Ct. 2739. Under contemporary international law, federal courts have permitted plaintiffs to pursue ATS claims based on a broad range of misconduct, including genocide, war crimes, torture, and supporting terrorism.
While Sosa therefore permits the application of contemporary international law in an ATS claim, federal courts must exercise restraint when doing so. Sosa described this restraint through a historically focused standard for determining when an ATS claim may be based on contemporary international law. Under this test, “federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted.” Id. at 732, 124 S.Ct. 2739. This standard “is suggestive rather than precise,” and is perhaps “best understood as the statement of a mood — and the mood is one of caution.” Flomo v. Firestone Natural Rubber Co., LLC, 643 F.3d 1013, 1016 (7th Cir.2011). Applying this standard, courts focus on whether a contemporary international legal norm underlying a proposed ATS claim is “specific, universal, and obligatory.” In re Estate of Marcos Human Rights Litig., 25 F.3d 1467, 1475 (9th Cir.1994); Sosa, 542 U.S. at 732, 124 S.Ct. 2739 (citing this definition with approval).
Additionally, Sosa held that the decision to recognize a new cause of action must “involve an element of judgment about the practical consequences of making that cause available to litigants in the federal courts.” Sosa, 542 U.S. at 732-33, 124 S.Ct. 2739. This inquiry focuses on “the consequences that might result from making the cause of action generally available to all potential plaintiffs,” and permits courts “to consider other prudential concerns consistent with Sosa’s approach.” Khulumani, 504 F.3d at 268 (Katzmann, J., concurring).
The body of international law that supplies the norms underlying an ATS claim is often referred to as “customary international law,” which consists of “rules that States universally abide by, or accede to, out of a sense of legal obligation and mutual concern.” Id. at 267 (Katzmann, J., concurring) (quoting Flores v. S. Peru Copper Corp., 414 F.3d 233, 248 (2d Cir.2003)); see also The Paquete Habana, 175 U.S. 677, 707-08, 20 S.Ct. 290, 44 L.Ed. 320 (1900); Abagninin, 545 F.3d at 738. To determine the content of customary international law, courts “look to the sources of law identified by the Statute of the International Court of Justice.” Khulumani, 504 F.3d at 267 (Katzmann, J., concurring). These sources include international conventions, international customs, “the general principles of law recognized by civilized nations,” “judicial decisions,” and the works of scholars. Id.; see also Restatement (Third) of Foreign Relations Law § 102 (1987) (identifying similar sources). Courts also consult authorities that provide an authoritative expression of the *1020 views of the international community even if, strictly speaking, the authority is not meant to reflect customary international law. Khulumani, 504 F.3d at 267 (Katzmann, J., concurring) (relying on the Rome Statute of the International Criminal Court).
Here, the parties look primarily to three sources of customary international law. The first are decisions of the post — World War II International Military Tribunal at Nuremberg, which are widely recognized as a critical part of customary international law and regularly invoked in ATS litigation. See, e.g., Khulumani, 504 F.3d at 271 (Katzmann, J., concurring). The second are decisions issued by the International Criminal Tribunals for Rwanda and the former Yugoslavia (ICTR and ICTY, respectively), which were convened to prosecute violations of international humanitarian law committed in Rwanda during 1994 and war crimes that took place in the Balkans during the 1990s. These decisions are also recognized as authoritative sources of customary international law. Id. at 278-79; Abagninin, 545 F.3d at 739. The third is a recent decision issued by the Special Court for Sierra Leone (SCSL), which was convened to address violations of international humanitarian law in Sierra Leone since November 30, 1996. Prosecutor v. Taylor, Case No. SCSL-03-01-A (SCSL Sept. 26, 2013). We consider this decision to be a proper source of international law for ATS claims. The parties also cite the Rome Statute of the International Criminal Court in their briefing, but, as discussed in more detail below, dispute its relevance in this case.
The specific norms underlying the plaintiffs’ ATS claim are the norms against aiding and abetting slave labor, which the defendants allegedly violated by providing financial and non-financial assistance to cocoa farmers in the Ivory Coast. The defendants argue that this claim should be dismissed, for three reasons. First, the defendants argue that there is no specific, universal, and obligatory norm preventing corporations — as opposed to individuals— from aiding and abetting slave labor. Second, the defendants argue that the plaintiffs’ complaint fails to allege the actus reus and mens rea elements of an aiding and abetting claim. Finally, the defendants argue that the plaintiffs’ complaint improperly seeks extraterritorial application of federal law contrary to the Supreme Court’s recent decision in Kiobel v. Royal Dutch Petroleum Co., — U.S. —, 133 S.Ct. 1659, 185 L.Ed.2d 671 (2013) (“Kiobel II”). We consider each argument in turn.
A. Corporate Liability under the ATS
 The primary focus of international law, although not its exclusive focus, is the conduct of states. Kiobel v. Royal Dutch Petroleum Co., 621 F.3d 111, 165 (2d Cir.2010) (Leval, J., concurring) (“Kio-bel I ”). Many of its prohibitions therefore only apply to state action, and an important issue in ATS litigation can be determining whether the norm asserted by the plaintiff is applicable to both state actors and private actors. This issue is illustrated by the contrasting decisions of the D.C. Circuit in Tel-Oren v. Libyan Arab Republic and the Second Circuit in Kadic v. Karadzic. In Tel-Oren, Judge Edwards concluded that the plaintiffs’ ATS claim was barred because there was no consensus that international law applied to torture carried out by non-state actors. 726 F.2d 774, 791-95 (D.C.Cir.1984). In Kadic, by contrast, the Second Circuit held that international law’s prohibition on genocide applies regardless of whether the perpetrator is acting on behalf of a state. 70 F.3d 232, 241-42 (2d Cir.1995).
*1021 The Supreme Court’s only allusion to corporate liability occurred in a footnote that referenced these discussions in Tel-Oren and Kadic. Sosa, 542 U.S. at 732 n. 20, 124 S.Ct. 2739. In the footnote, the Court directed federal courts contemplating the recognition of new ATS claims to consider “whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual.” Id. (emphasis added).
The issue of corporate liability has been more thoroughly examined in the circuit courts, which have disagreed about whether and under what circumstances corporations can face liability for ATS claims. Kiobel I, 621 F.3d at 145; Doe v. Exxon Mobil Corp., 654 F.3d 11, 57 (D.C.Cir.2011), vacated on other grounds by 527 Fed.Appx. 7 (D.C.Cir.2013); Sarei v. Rio Tinto, PLC, 671 F.3d 736, 747 (9th Cir.2011), vacated on other grounds by — U.S. —, 133 S.Ct. 1995, 185 L.Ed.2d 863 (2013); Flomo, 643 F.3d at 1020-21. Here, we reaffirm the corporate liability analysis reached by the en banc panel of our circuit in Sarei v. Rio Tinto.
In Sarei the plaintiffs sought to hold corporate defendants liable for aiding and abetting genocide and war crimes. We first rejected the defendants’ argument that corporations can never be sued under the ATS. Rather than adopting a blanket rule of immunity or liability, the Sarei court held that for each ATS claim asserted by the plaintiffs, a court should look to international law and determine whether corporations are subject to the norms underlying that claim. Id. at 748 (“Sosa expressly frames the relevant international-law inquiry to be the scope of liability of private actors for a violation of the ‘given norm,’ i.e. an international-law inquiry specific to each cause of action asserted.”). Thus, we adopted a norm-by-norm analysis of corporate liability.
The Sarei court then conducted corporate liability analyses for the two norms underlying the plaintiffs’ claims, the norm against genocide and the norm against war crimes. Id. at 759-61, 764-65. The en banc panel observed that both norms apply to states, individuals, and groups, and that the applicability of the norms turns on the “specific identity of the victims rather than the identity of the perpetrators.” Id. at 760, 764-65 (emphasis added). Thus, we concluded that the norms were “universal” or applicable to “all actors,” and, consequently, applicable to corporations. Id. at 760, 765. We reasoned that allowing an actor to “avoid liability merely by incorporating” would be inconsistent with the universal quality of these norms. See id. at 760 (discussing genocide).
In Sarei we also explained that a norm could form the basis for an ATS claim against a corporation even in the absence of a decision from an international tribunal enforcing that norm against a corporation. Id. at 761 (“We cannot be bound to find liability only where international fora have imposed liability.”). Contra Kiobel I, 621 F.3d at 131-45. We explained that the absence of decisions finding corporations liable does not imply that corporate liability is a legal impossibility under international law, and also noted that the lack of decisions holding corporations liable could be explained by strategic considerations. Sarei, 671 F.3d at 761 (citing Jonathan A. Bush, The Prehistory of Corporations and Conspiracy in International Criminal Law: What Nuremberg Really Said, 109 Colum. L.Rev. 1094, 1149-68 (2009)). Rejecting an analysis that focuses on past enforcement, Sarei reaffirmed that corporate liability ultimately turns on an analysis of the norm underlying the ATS claim. Id. at 760-61 (“We ... believe the proper *1022 inquiry is not whether there is a specific precedent so holding, but whether international law extends its prohibitions to the perpetrators in question.”).
We thus established three principles about corporate ATS liability in Sar-ei, that we now reaffirm. First, the analysis proceeds norm-by-norm; there is no categorical rule of corporate immunity or liability. Id. at 747-48. Second, corporate liability under an ATS claim does not depend on the existence of international precedent enforcing legal norms against corporations. Id. at 760-61. Third, norms that are “universal and absolute,” or applicable to “all actors,” can provide the basis for an ATS claim against a corporation. Id. at 760. To determine whether a norm is universal, we consider, among other things, whether it is “limited to states” and whether its application depends on the identity of the perpetrator. Id. at 764-65.
We conclude that the prohibition against slavery is universal and may be asserted against the corporate defendants in this case. Private, non-state actors were held hable at Nuremberg for slavery offenses. The Flick Case, 6 Trials of War Criminals (T.W.C.) 1194, 1202. Moreover, the statutes of the International Criminal Tribunals for Rwanda and the former Yugoslavia are broadly phrased to condemn “persons responsible” for enslavement of civilian populations. ICTY Statute Art. 5(c), U.N. S/RES/827 (May 25, 1993); ICTR Statute Art. 3(c), U.N. S/RES/955 (Nov. 8, 1994). The prohibition against slavery applies to state actors and non-state actors alike, and there are no rules exempting acts of enslavement carried out on behalf of a corporation. Indeed, it would be contrary to both the categorical nature of the prohibition on slavery and the moral imperative underlying that prohibition to conclude that incorporation leads to legal absolution for acts of enslavement. Kiobel I, 621 F.3d at 155 (Leval, J., concurring) (“The majority’s interpretation of international law, which accords to corporations a free pass to act in contravention of international law’s norms, conflicts with the humanitarian objectives of that body of law.”).
A final point of clarification is in order about the role of domestic and international law. Although international law controls the threshold question of whether an international legal norm provides the basis for an ATS claim against a corporation, there remain several issues about corporate liability which must be governed by domestic law. This division of labor is dictated by international legal principles, because international law defines norms and determines their scope, but delegates to domestic law the task of determining the civil consequences of any given violation of these norms. Id. at 172 (Leval, J., concurring); Exxon, 654 F.3d at 42-43; Flomo, 643 F.3d at 1020. Thus, when questions endemic to tort litigation or civil liability arise in ATS litigation — such as damages computation, joint and several liability, and proximate causation — these issues must be governed by domestic law. Many questions that surround corporate liability fall into this category, including, most importantly, the issue of when the actions of an individual can be attributed to a corporation for purposes of tort liability. Determining when a corporation can be held liable therefore requires a court to apply customary international law to determine the nature and scope of the norm underlying the plaintiffs’ claim, and domestic tort law to determine whether recovery from the corporation is permissible.
Our holding that the norm against slavery is universal and thus may be asserted against the defendants addresses only the international legal issues related to corporate liability in this case. We do not ad *1023 dress other domestic law questions related to corporate liability, and leave them to be addressed by the district court in the first instance.
B. Aiding and Abetting Liability
We next consider whether the plaintiffs’ complaint alleges the elements of a claim for aiding and abetting slavery. Customary international law — not domestic law — provides the legal standard for aiding and abetting ATS claims. Sarei, 671 F.3d at 765-66. When choosing between competing legal standards, we consider which one best reflects a consensus of the well-developed democracies of the world. See Sosa, 542 U.S. at 732, 124 S.Ct. 2739 (directing federal courts to apply legal norms in ATS litigation that are accepted by “civilized nations”); Khulumani, 504 F.3d at 276 (Katzmann, J., concurring) (consulting the Rome Statute’s aiding and abetting legal standard in part due to its wide acceptance among “most of the mature democracies of the world”).
1. Mens Rea
The plaintiffs argue that the required mens rea for aiding and abetting is knowledge, specifically, knowledge that the aider and abetter’s acts would facilitate the commission of the underlying offense. This knowledge standard dates back to the Nuremberg tribunals, and is well illustrated by the Zyklon B Case, 1 Law RepoRts of Trials of Wae Criminals 93 (1946). There, the defendants supplied poison gas to the Nazis knowing that it would be used to murder innocent people, and were convicted of aiding and abetting war crimes. Id. at 101. An analogous knowledge standard is applied in The Flick Case, where a defendant was convicted of aiding and abetting war crimes for donating money to the leader of the SS, knowing that it would be used to support a criminal organization. 6 T.W.C. 1216-17, 1220-21; see also The Ministries Case, 14 T.W.C. 622 (concluding that the defendant’s knowledge regarding the intended use of a loan was sufficient to satisfy the mens rea requirement, but declining to find that the defendant satisfied the actus reus requirement).
As plaintiffs contend, this knowledge standard has also been embraced by contemporary international criminal tribunals. The International Criminal Tribunals for Rwanda and the former Yugoslavia consistently apply a knowledge standard. In Prosecutor v. Blagojevic, for instance, the tribunal stated that “[t]he requisite mental element of aiding and abetting is knowledge that the acts performed assist the commission of the specific crime of the principal perpetrator.” No. IT-02-60-A, ¶ 127 (ICTY, May 9, 2007) (“Blagojevic”); see also Prosecutor v. Kayishema, No. ICTR-95-1-T, ¶ 205 (ICTR, May 21, 1999); Khulumani, 504 F.3d at 277-79 (Katzmann, J., concurring) (observing that the ICTY and ICTR decisions apply a knowledge standard); Exxon, 654 F.3d at 33-34 (same). Additionally, after conducting an extensive review of customary international law, the Appeals Chamber of the Special Court for Sierra Leone recently affirmed this knowledge standard, concluding that “an accused’s knowledge of the consequence of his acts or conduct — that is, an accused’s ‘knowing participation’ in the crimes — is a culpable mens rea standard for individual criminal liability.” Taylor, ¶ 483.
However, two of our sister circuits have concluded that knowledge is insufficient and that an aiding and abetting ATS defendant must act with the purpose of facilitating the criminal act, relying on the Rome Statute of the International Criminal Court, 37 I.L.M. 999 (1998) (“Rome Statute”). See Aziz v. Alcolac, Inc., 658 F.3d 388, 399-400 (4th Cir.2011); Presby *1024 terian Church of Sudan v. Talisman Energy, Inc., 582 F.3d 244, 259 (2d Cir.2009). These circuits have interpreted the Rome Statute to bar the use of a knowledge standard because it uses the term “purpose” to define aiding and abetting liability:
[A] person shall be criminally responsible and liable for punishment for a crime within the jurisdiction of the Court if that person ... [f]or the purpose of facilitating the commission of such a crime, aids, abets, or otherwise assists in its commission....
Rome Statute, art. 25(3)(c) (emphasis added). Taking this text at face value, as the Second and Fourth Circuits did, it appears that the Rome Statute rejects a knowledge standard and requires the heightened mens rea of purpose, suggesting that a knowledge standard lacks the universal acceptance that Sosa demands.
Here, we need not decide whether a purpose or knowledge standard applies to aiding and abetting ATS claims. We conclude that the plaintiffs’ allegations satisfy the more stringent purpose standard, and therefore state a claim for aiding and abetting slavery. All international authorities agree that “at least purposive action ... constitutes aiding and abetting[.]” Sarei, 671 F.3d at 765-66 (declining to determine whether the mens rea required for an aiding and abetting claim is knowledge or purpose).
Reading the allegations in the light most favorable to the plaintiffs, one is led to the inference that the defendants placed increased revenues before basic human welfare, and intended to pursue all options available to reduce their cost for purchasing cocoa. Driven by the goal to reduce costs in any way possible, the defendants allegedly supported the use of child slavery, the cheapest form of labor available. These allegations explain how the use of child slavery benefited the defendants and furthered their operational goals in the Ivory Coast, and therefore, the allegations support the inference that the defendants acted with the purpose to facilitate child slavery.
The defendants’ alleged plan to benefit from the use of child slave labor starkly distinguishes this case from other ATS decisions where the purpose standard was not met. See Talisman, 582 F.3d at 262-64; Aziz, 658 F.3d at 390-91, 401. According to the allegations here, the defendants have not merely profited by doing business with known human rights violators. Instead, they have allegedly sought to accomplish their own goals by supporting violations of international law. In Talisman, by contrast, the defendant did not in any way benefit from the underlying human rights atrocities carried out by the Sudanese military, and in fact, those atrocities ran contrary to the defendant’s goals in the area, and even forced the defendant to abandon its operations. Talisman, 582 F.3d at 262. Similarly, in Aziz, the plaintiffs alleged that the defendants sold chemicals knowing they would be used to murder Kurds in northern Iraq, but failed to allege that the defendants had anything to gain from the use of chemical weapons. Aziz, 658 F.3d at 394, 401. Thus, in Talisman and Aziz, the purpose standard was not satisfied because the defendants had nothing to gain from the violations of international law, and in Talisman, the violations actually ran counter to the defendants’ interest. Here, however, the complaint alleges that the defendants obtained a direct benefit from the commission of the violation of international law, which bolsters the allegation that the defendants acted with the purpose to support child slavery.
The defendants’ control over the Ivory Coast cocoa market further supports the *1025 allegation that the defendants acted with the purpose to facilitate slavery. According to the complaint, the defendants had enough control over the Ivorian cocoa market that they could have stopped or limited the use of child slave labor by their suppliers. The defendants did not use their control to stop the use of child slavery, however, but instead offered support that facilitated it. Viewed alongside the allegation that the defendants benefítted from the use of child slavery, the defendants’ failure to stop or limit child slavery supports the inference that they intended to keep that system in place. The defendants had the means to stop or limit the use of child slavery, and had they wanted the slave labor to end, they could have used their leverage in the cocoa market to stop it. Their alleged failure to do so, coupled with the cost-cutting benefit they allegedly receive from the use of child slaves, strongly supports the inference that the defendants acted with purpose.
The defendants’ alleged lobbying efforts also corroborate the inference of purpose. According to the complaint, the defendants participated in lobbying efforts designed to defeat federal legislation that would have required chocolate importers and manufacturers to certify and label their chocolate as “slave free.” As an alternative to the proposed legislation, the defendants, along with others from the chocolate industry, supported a voluntary mechanism through which the chocolate industry would police itself. The complaint also alleges that when the voluntary enforcement system was eventually put into practice instead of legislation, it “in effect guaranteed the continued use of the cheapest labor available to produce [cocoa] — that of child slaves.”
Despite these detailed allegations, the dissent contends that the complaint should be dismissed as implausible under Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). The allegation of purpose is not, however, a bare and eoncluso-ry assertion that is untethered from the facts underlying the plaintiffs’ claims. Instead, the complaint specifically ties the defendants’ alleged purpose to the defendants’ economic goals in the Ivory Coast, their control over the cocoa market, and their lobbying efforts. The factual allegations concerning the defendants’ goals and business operations give rise to a reasonable inference that the defendants acted with purpose, and that is enough to satisfy Iqbal. Id. at 678-79, 129 S.Ct. 1937; Moss v. U.S. Secret Serv., 572 F.3d 962, 969 (9th Cir.2009) (“In sum, for a complaint to survive a motion to dismiss, the non-concluso-ry ‘factual content,’ and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief.”).
We also disagree with the dissent’s assertion that the plaintiffs have conceded that their allegations fail to satisfy the purpose standard. The plaintiffs have maintained throughout this appeal that the purpose standard has been satisfied. They only conceded that the defendants did not have the subjective motive to harm children. Indeed, the complaint is clear that the defendants’ motive was finding cheap sources of cocoa; there is no allegation that the defendants supported child slavery due to an interest in harming children in West Africa.
This is not to say that the purpose standard is satisfied merely because the defendants intended to profit by doing business in the Ivory Coast. Doing business with child slave owners, however morally reprehensible that may be, does not by itself demonstrate a purpose to support child slavery. Here, however, the defendants allegedly intended to support the use of child slavery as a means of reducing their production costs. In doing so, the defen *1026 dants sought a legitimate goal, profit, through illegitimate means, purposefully supporting child slavery.
Thus, the allegations suggest that a myopic focus on profit over human welfare drove the defendants to act with the purpose of obtaining the cheapest cocoa possible, even if it meant facilitating child slavery. These allegations are sufficient to satisfy the mens rea required of an aiding and abetting claim under either a knowledge or purpose standard.
2. Actus Reus
We next consider whether the plaintiffs have alleged the actus reus elements of an aiding and abetting claim. The actus reus of aiding and abetting is providing assistance or other forms of support to the commission of a crime. Blago-jevic, ¶ 127; Taylor, ¶ 362; Rome Statute, art. 25(3)(c). As both parties agree, international law further requires that the assistance offered must be substantial. Bla-gojevic, ¶ 127; Taylor, ¶ 362. The parties dispute, however, whether international law imposes the additional requirement that the assistance must be specifically directed towards the commission of the crime.
The “specific direction” requirement appears to have originated in decisions issued by the International Criminal Tribunal for the former Yugoslavia. See Prosecutor v. Tadic, Case No. IT-94-1-A (ICTY July 15, 1999); Prosecutor v. Perisic, Case No. IT-04-81-A, (ICTY Feb. 28, 2013) (“Perisic”). In Tadic, the Appeals Chamber used the phrase “specifically directed” to distinguish joint criminal enterprise liability from aiding and abetting liability. Tadic, ¶¶ 227-29. While joint criminal enterprise liability only requires an individual to engage in conduct that “in some way” assisted the commission of a crime, the Appeals Chamber stated that aiding and abetting liability requires an individual to engage in conduct that is “specifically directed” towards the commission of a crime. Id. ¶ 229(h). In Perisic, a later panel of the Appeals Chamber clarified that the specific direction requirement relates to the “link” between the assistance provided and the principal offense, and requires that “assistance must be ‘specifically’— rather than ‘in some way’ — directed towards the relevant crimes.” Perisic, ¶ 27, 37 (quoting Tadic, ¶ 229).
Some Appeals Chamber panels and other international tribunals have explicitly rejected the specific direction requirement. Prosecutor v. Mrksic, Case No. IT-95-13/1-A, ¶ 159 (ICTY May 5, 2009) (“[T]he Appeals Chamber has confirmed that ‘specific direction’ is not an essential ingredient of the actus reus of aiding and abetting.”); Blagojevic, ¶ 189 (“[Sjpecific direction has not always been included as an element of the actus reus of aiding and abetting.”); Taylor, ¶ 481. Beneath this controversy, however, there is widespread substantive agreement about the actus reus of aiding and abetting. As the Special Court for Sierra Leone Appeals Chambers recently affirmed, “[t]he actus reus of aiding and abetting liability is established by assistance that has a substantial effect on the crimes, not the particular manner in which such assistance is provided.” Taylor, ¶ 475. What appears to have emerged is that there is less focus on specific direction and more of an emphasis on the existence of a causal link between the defendants and the commission of the crime. However, we decline to adopt an actus reus standard for aiding and abetting liability under the ATS. Instead, we remand to the district court with instructions to allow plaintiffs to amend their complaint in light of Perisic and Taylor, both of which were decided after the com *1027 plaint in this case was dismissed and this appeal had been filed.
C. Extraterritorial ATS Claims
The defendants’ final argument contends that the plaintiffs’ ATS claim seeks an extraterritorial application of federal law that is barred by the Supreme Court’s recent decision in Kiobel II, 133 S.Ct. at 1669. We decline to resolve the extraterritoriality issue, and instead remand to allow the plaintiffs to amend their complaint in light of Kiobel II.
The Supreme Court’s decision in Kiobel II is concerned with the application of the presumption against extraterritoriality to ATS claims. The presumption against extraterritoriality is a canon of statutory construction, and embodies the default assumption that legislation of Congress is only meant to apply within the territory of the United States. Morrison v. Nat’l Austl. Bank Ltd., 561 U.S. 247, 130 S.Ct. 2869, 2877, 177 L.Ed.2d 535 (2010). Under this canon of construction, a statute should be construed to reach only conduct within the United States unless Congress affirmatively states that the statute applies to conduct abroad. Id. (quoting EEOC v. Arabian Am. Oil Co. (Aramco), 499 U.S. 244, 248, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991)). The presumption is meant to provide “a stable background against which Congress can legislate with predictable effects,” Morrison, 130 S.Ct. at 2881, and also “protect against unintended clashes between our laws and those of other nations which could result in international discord,” Aramco, 499 U.S. at 248, 111 S.Ct. 1227.
Since the presumption against extraterritoriality is a canon of statutory construction, it has no direct application to ATS claims, which, as discussed above, are claims created by federal common law, not statutory claims created by the ATS itself. Kiobel II, 133 S.Ct. at 1664. In Kiobel II, however, the Supreme Court explained that the prudential concerns about judicial interference in foreign policy are particularly strong in ATS litigation, and concluded that “the principles underlying the presumption against extraterritoriality thus constrain courts exercising their power under the ATS.” Id. The Court also concluded that nothing in the text, history, and purpose of the ATS rebutted the presumption of extraterritoriality. Id. at 1669.
Turning to the specific claims asserted by the Kiobel II plaintiffs, the Court observed that “all the relevant conduct took place outside the United States,” and that the defendants were foreign corporations whose only connection to the United States lay in their presence in this country. Id. The Court held that these claims were therefore barred, reasoning that they sought relief for violations of international law occurring outside the United States, and did not “touch and concern the territory of the United States ... with sufficient force to displace the presumption against extraterritorial application.” Id.
Kiobel II’s holding makes clear that the general principles underlying the presumption against extraterritoriality apply to ATS claims, but it leaves important questions about extraterritorial ATS claims unresolved. See id. (Kennedy, J., concurring) (“The opinion for the Court is careful to leave open a number of significant questions regarding the reach and interpretation of the Alien Tort Statute.”). In particular, Kiobel II articulates a new “touch and concern” test for determining when it is permissible for an ATS claim to seek the extraterritorial application of federal law. Id. But the opinion does not explain the nature of this test, except to say that it is not met when an ATS plaintiff asserts a cause of action against a foreign corporation based solely on foreign *1028 conduct. Id. (Alito, J., concurring) (observing that the Court’s formulation of the touch and concern test “obviously leaves much unanswered”); see also Tymoshenko v. Firtash, 2013 WL 4564646, at *4 (S.D.N.Y. Aug.28, 2013) (“[T]he Court failed to provide guidance regarding what is necessary to satisfy the ‘touch and concern’ standard.”).
The defendants argue that the touch and concern test is substantially the same as the “focus” test set out in Morrison v. National Australia Bank Ltd., 130 S.Ct. at 2884. Morrison’s focus test is a tool of statutory interpretation. It is used to determine when statutes without extraterritorial application can be applied to a course of conduct that occurred both domestically and abroad. Id. Under this test, courts first determine the “focus of congressional concern” for a statute, and allow the statute to be applied to a course of conduct if the events coming within the statute’s focus occurred domestically. Id. (internal quotation marks omitted). In Morrison, for example, the Court reasoned that the focus of the Exchange Act is the purchase and sale of securities, and therefore held that it applies only to “transactions in securities listed on domestic exchanges, and domestic transactions in other securities.” Id. The Court then held that the anti-fraud provisions of the Exchange Act did not apply to a foreign sale of securities that were listed on an Australian exchange. Id. at 2888.
Momson may be informative precedent for discerning the content of the touch and concern standard, but the opinion in Kiobel II did not incorporate Morrison’s focus test. Kiobel II did not explicitly adopt Morrison’s focus test, and chose to use the phrase “touch and concern” rather than the term “focus” when articulating the legal standard it did adopt. Moreover, the assertion that Kiobel II meant to direct lower courts to apply the familiar Morrison focus test is belied by the concurring opinions, which note that the standard in Kiobel II leaves “much unanswered.” Kiobel II, 133 S.Ct. at 1669 (Alito, J., concurring); see also id. (Kennedy, J., concurring). Additionally, since the focus test turns on discerning Congress’s intent when passing a statute, it cannot sensibly be applied to ATS claims, which are common law claims based on international legal norms.
Rather than attempt to apply the amorphous touch and concern test on the record currently before us, we conclude that the plaintiffs should have the opportunity to amend their complaint in light of Kiobel II. It is common practice to allow plaintiffs to amend their pleadings to accommodate changes in the law, unless it is clear that amendment would be futile. Moss, 572 F.3d at 972 (“Having initiated the present lawsuit without the benefit of the Court’s latest pronouncements on pleadings, Plaintiffs deserve a chance to supplement their complaint ...”). Here, the plaintiffs seek to amend their complaint to allege that some of the activity underlying their ATS claim took place in the United States. On the record before us, we are unable to conclude that amendment would be futile, because unlike the claims at issue in Kiobel II, the plaintiffs contend that part of the conduct underlying their claims occurred within the United States. See Kiobel II, 133 S.Ct. at 1669. Moreover, it would be imprudent to attempt to apply and refíne the touch and concern test where the pleadings before us make no attempt to explain what portion of the conduct underlying the plaintiffs claims took place within the United States.
We therefore decline to determine, at present, whether the plaintiffs’ ATS claim is barred by the Supreme Court’s holding *1029 in Kiobel II, and remand this case to allow the plaintiffs to amend their complaint.
IV. Conclusion
The district court’s order is REVERSED, and we VACATE for further proceedings consistent with this opinion.[2]
IT IS SO ORDERED.

. The facts set forth in our background section are drawn from the allegations in the plaintiffs’ First Amended Complaint, which we must accept as true for purposes of evaluating a motion to dismiss. Seven Arts Filmed Entm’t Ltd. v. Content Media Corp. PLC, 733 F.3d 1251, 1254 (9th Cir.2013).

. We need not reach the parties’ remaining arguments in light of our decision to remand with instructions that the district court allow leave to amend.