**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| JOHN DOE, I; JOHN DOE, II; JOHN DOE, III; JOHN DOE, IV; JOHN DOE, V; and JOHN DOE, VI, each individually and on behalf of proposed class members, *Plaintiffs-Appellants*, | No. 17-55435 D.C. No. 2:05-cv-05133-SVW-MRW |
| v. | OPINION |
| NESTLE, S.A.; NESTLE USA, INC.; NESTLE IVORY COAST; CARGILL INCORPORATED COMPANY; CARGILL COCOA; CARGILL WEST AFRICA, S. A.; ARCHER DANIELS MIDLAND COMPANY, *Defendants-Appellees.* | |

Appeal from the United States District Court
for the Central District of California
Stephen V. Wilson, District Judge, Presiding

Argued and Submitted June 7, 2018
Pasadena, California

Filed October 23, 2018

Before:  Dorothy W. Nelson and Morgan Christen, Circuit
Judges, and Edward F. Shea,[*] District Judge.

Opinion by Judge D.W. Nelson;
Concurrence by Judge Shea

## SUMMARY[**]

### Alien Tort Statute

The panel reversed the district court's dismissal of claims alleging aiding and abetting slave labor that took place in the United States under the Alien Tort Statute (ATS).

The plaintiffs, former child slaves who were forced to work on cocoa farms in the Ivory Coast, brought the action against large manufacturers, purchasers, processors, and retail sellers of cocoa beans.  The district court concluded that the complaint seeks an impermissible extraterritorial application of the ATS.

Rejecting the defendants' argument that the focus of the ATS is limited to principal offenses, the panel held that aiding and abetting comes within the ATS's focus on torts committed in violation of the law of nations.

---

[*] The Honorable Edward F. Shea, United States District Judge for the Eastern District of Washington, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

The panel also held that a narrow set of specific domestic conduct alleged by the plaintiffs is relevant to the ATS's focus – namely, that the defendants provided personal spending money outside the ordinary business contract with the purpose to maintain ongoing relations with the farms so that the defendants could continue receiving cocoa at a price that would be not be obtainable without child slave labor; and that the defendants had employees from their United States headquarters regularly inspect operations in the Ivory Coast and report back to the United States offices, where these financing decisions or arrangements originated.

The panel deemed it unnecessary at this time to reach the issue of whether the plaintiffs have sufficiently alleged the elements of aiding and abetting. In light of *Jesner v. Arab Bank*, 138 S. Ct. 1386 (2018), which changed the legal landscape on which the plaintiffs constructed their case, the panel remanded to allow the plaintiffs to amend their complaint to specify whether aiding and abetting conduct that took place in the United States is attributable to the domestic corporations in this case.

District Judge Shea concurred in the result.

---

## COUNSEL

Paul L. Hoffman (argued), John Washington, and Catherine Sweetser, Schonbrun Seplow Harris & Hoffman LLP, Los Angeles, California; Terrence P. Collingsworth, International Human Rights Advocates, Washington, D.C.; for Plaintiffs-Appellants.

Theodore J. Boutrous, Jr. (argued), Abbey Hudson, Matthew A. Hoffman, and Perlette Michèle Jura, Gibson Dunn & Crutcher LLP, Los Angeles, California; Christopher B. Leach and Theodore B. Olson, Gibson Dunn & Crutcher LLP, Washington, D.C.; Colleen Sinzdak, David M. Foster, Craig A. Hoover, and Neal Kumar Katyal, Hogan Lovells US LLP, Washington, D.C.; for Defendant-Appellee Nestlé USA, Inc.

Andrew John Pincus (argued) and Kevin S. Ranlett, Mayer Brown LLP, Washington, D.C.; Lee H. Rubin, Mayer Brown LLP, Mayer Brown LLP, Palo Alto, California; for Defendant-Appellee Cargill Incorporated.

Marc B. Robertson and Richard A. Stamp, Washington Legal Foundation, Washington, D.C., for Amicus Curiae Washington Legal Foundation.

## OPINION

D.W. NELSON, Circuit Judge:

### *OVERVIEW*

Plaintiffs-Appellants ("Plaintiffs"), former child slaves who were forced to work on cocoa farms in the Ivory Coast, filed a class action lawsuit against Defendants-Appellees Nestle, SA, Nestle USA, Nestle Ivory Coast, Archer Daniels Midland Co. ("ADM"),[1] Cargill Incorporated Company, and Cargill West Africa, SA ("Defendants"). In their Second Amended Complaint, plaintiffs alleged claims for aiding and

---

[1] Plaintiffs voluntarily dismissed ADM from this case.

abetting slave labor that took place in the United States under the Alien Tort Statute, 28 U.S.C. § 1350 ("ATS"). The district court dismissed the claims below based on its conclusion that plaintiffs sought an impermissible extraterritorial application of the ATS. We reverse and remand. In light of an intervening change in controlling law, we think it unnecessary to consider the other issues this case presents at this juncture.

## BACKGROUND

### I. Factual Background

We discussed much of the factual background of this case in *Doe I v. Nestle USA, Inc.*, 766 F.3d 1013 (9th Cir. 2014) ("*Nestle I*"). Child slavery on cocoa farms in the Ivory Coast, where seventy percent of the world's cocoa is produced, is a pervasive humanitarian tragedy.

Plaintiffs are former child slaves who were kidnapped and forced to work on cocoa farms in the Ivory Coast for up to fourteen hours a day without pay. While being forced to work on the cocoa farms, plaintiffs witnessed the beating and torture of other child slaves who attempted to escape.

Defendants are large manufacturers, purchasers, processors, and retail sellers of cocoa beans. Several of them are foreign corporations that are not subject to suit under the ATS. *Jesner v. Arab Bank*, 138 S. Ct. 1386, 1407 (2018). The effect of *Jesner* in tandem with plaintiffs' habit of describing defendants en masse presents a challenge we address below. For now, we describe the case as plaintiffs present it. We take their plausible allegations as true and

draw all reasonable inferences in their favor. *See Nestle I*, 766 F.3d at 1018.

Because of their economic leverage over the cocoa market, defendants effectively control cocoa production in the Ivory Coast. Defendant Nestle, USA is headquartered in Virginia and coordinates the major operations of its parent corporation, Nestle, SA, selling Nestle-brand products in the United States. Every major operational decision regarding Nestle's United States market is made in or approved in the United States. Defendant Cargill, Inc. is headquartered in Minneapolis. The business is centralized in Minneapolis and decisions about buying and selling commodities are made at its Minneapolis headquarters.

Defendants operate with the unilateral goal of finding the cheapest source of cocoa in the Ivory Coast. Not content to rely on market forces to keep costs low, defendants have taken steps to perpetuate a system built on child slavery to depress labor costs. To maintain their supply of cocoa, defendants have exclusive buyer/seller relationships with Ivory Coast farmers, and provide those farmers with financial support, such as advance payments and personal spending money. 19 Malian child slaves were rescued from a farm with whom Cargill has an exclusive buyer/seller relationship. Defendants also provide tools, equipment, and technical support to farmers, including training in farming techniques and farm maintenance. In connection with providing this training and support, defendants visit their supplier farms several times per year.

Defendants were well aware that child slave labor is a pervasive problem in the Ivory Coast. Nonetheless, defendants continued to provide financial support and

technical farming aid, even though they knew their acts would assist farmers who were using forced child labor, and knew their assistance would facilitate child slavery. Indeed, the gravamen of the complaint is that defendants depended on—and orchestrated—a slave-based supply chain.

## II. Procedural History

Plaintiffs began this lawsuit over a decade ago, and we had occasion to consider it once before in *Nestle I*. On remand after *Nestle I*, defendants moved to dismiss the operative complaint and the district court granted the motion. In its order, the district concluded that the complaint seeks an impermissible extraterritorial application of the ATS because defendants engaged domestically only in ordinary business conduct. The district court did not decide whether plaintiffs stated a claim for aiding and abetting child slavery.

Plaintiffs timely appealed.

### STANDARD OF REVIEW

We review a dismissal for lack of jurisdiction de novo. *Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 979 (9th Cir. 2007) (citing *Arakaki v. Lingie*, 477 F.3d 1048, 1056 (9th Cir. 2007)). "A dismissal for failure to state a claim is reviewed de novo. All factual allegations in the complaint are accepted as true, and the pleadings construed in the light most favorable to the nonmoving party." *Nestle I*, 766 F.3d at 1018 (quoting *Abagninin v. AMVAC Chem. Corp.*, 545 F.3d 733, 737 (9th Cir. 2008) (internal citations omitted)).

*DISCUSSION*

The legal landscape has shifted since we last considered this case, including during the pendency of this appeal. The Supreme Court's decisions in *Jesner* and *RJR Nabisco, Inc. v. European Community*,136 S. Ct. 2090 (2016), require us to revisit parts of *Nestle I*.

## I.  Corporate Liability Post-*Jesner*

In *Nestle I*, we held that corporations are liable for aiding and abetting slavery after applying three principles from our en banc decision in *Sarei v. Rio Tinto, PLC*, 671 F.3d 736, 746 (9th Cir. 2011) (en banc), *vacated on other grounds by Rio Tinto PLC v. Sarei*, 133 S. Ct. 1995 (2013).  *Nestle I*, 766 F.3d at 1022.  Our court in *Sarei* adopted a norm-specific analysis that determines "'whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued.'"  *Sarei*, 671 F.3d at 760 (quoting *Sosa*, 542 U.S. at 732 n.20).  "First, the analysis proceeds norm-by-norm; there is no categorical rule of corporate immunity or liability."  *Nestle I*, 766 F.3d at 1022 (citing *Sarei*, 671 F.3d at 747–48).  Under the second principle, "corporate liability under an ATS claim does not depend on the existence of international precedent enforcing legal norms against corporations." *Id.* (citing *Sarei*, 671 F.3d at 760–61). "Third, norms that are 'universal and absolute,' or applicable to 'all actors,' can provide the basis for an ATS claim against a corporation."  *Id.* (citing *Sarei*, 671 F.3d at 764–65).  We reaffirmed these principles in *Nestle I* and held that since the prohibition of slavery is "universal," it is applicable to all actors, including corporations.  *Id.* at 1022.

As we have noted, the Supreme Court in *Jesner* held that foreign corporations cannot be sued under the ATS. *Jesner*, 138 S. Ct. at 1407. *Jesner* thus abrogates *Nestle I* insofar as it applies to foreign corporations. But *Jesner* did not eliminate all corporate liability under the ATS, and we therefore continue to follow *Nestle I*'s holding as applied to domestic corporations. *See Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc).

## II. Extraterritorial ATS Claim

In *Kiobel v. Royal Dutch Petroleum Co. (Kiobel II)*, the Supreme Court held that the ATS does not have extraterritorial reach after applying a canon of statutory interpretation known as the presumption against extraterritorial application, which counsels that "[w]hen a statute gives no clear indication of an extraterritorial application, it has none." 569 U.S. 108, 115 (2013) (citing *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 248 (2010)). The Court acknowledged that the canon is not directly on point given that the ATS "does not directly regulate conduct or afford relief." *Id.* But given the foreign policy concerns the ATS poses, the Court stated that "the principles underlying the canon of interpretation similarly constrain courts considering causes of action that may be brought under the ATS." *Id.*

The Court in *Kiobel II* left the door open to the extraterritorial application of the ATS for claims made under the statute which "touch and concern the territory of the United States . . . with sufficient force to displace the presumption." *Id.* at 123 (citing *Morrison*, 561 U.S. at 264–73). Because "all the relevant conduct" in *Kiobel II* took place abroad, the Court did not need to delve into the

contours of the touch and concern test. *Id.* The only guidance the Court provided about the "touch and concern" test was that "mere corporate presence" would not suffice to meet it. *Id.*

In announcing the "touch and concern" test, the Supreme Court cited to its decision in *Morrison v. National Australia Bank Lt*. In *Morrison*, the Supreme Court undertook a two-step analysis, known as the "focus" test, to determine whether Section 10(b) of the Securities Exchange Act of 1934 applies extraterritorially. *Morrison*, 561 U.S. at 262. Under the first analytical step, the Court asked if there is any indication that the statute is meant to apply extraterritorially, and concluded there is not. *Id.* at 265. Under the second step, the Court asked what the "'focus' of congressional concern" was in passing Section 10(b). *Id.* The Court found that the "focus is not on the place where the deception originated, but on purchases and sales of securities in the United States. Section 10(b) [therefore] applies only to transactions in securities listed on domestic exchanges and domestic transactions in other securities." *Id.* at 249.

In the first appeal of this case, we reasoned that "*Morrison* may be informative precedent for discerning the content of the touch and concern standard, but the opinion in *Kiobel II* did not incorporate *Morrison's* focus test. *Kiobel II* did not explicitly adopt *Morrison's* focus test, and chose to use the phrase 'touch and concern' rather than the term 'focus' when articulating the legal standard it did adopt." *Nestle I*, 766 F.3d at 1028.

Defendants argue that the Supreme Court's recent decision in *RJR Nabisco* requires us to apply the focus test to claims under the ATS. In *RJR Nabisco*, the Court applied the

*Morrison* focus test to the Racketeer Influenced and Corrupt Organizations Act ("RICO") and reiterated that *Morrison* reflects a two-step inquiry regarding extraterritoriality. *Id.* at 2103. The Court further stated that "*Morrison* and *Kiobel* [also] reflect a two-step framework for analyzing extraterritoriality issues." *Id.* at 2101.

Because *RJR Nabisco* has indicated that the two-step framework is required in the context of ATS claims, we apply it here. *See Miller v. Gammie*, 335 F.3d at 893. First, we determine "whether the [ATS] gives a clear, affirmative indication that it applies extraterritorially." *RJR Nabisco*, 136 S. Ct. at 2101. The Court in *Kiobel II* already answered that the "presumption against extraterritoriality applies to claims under the ATS, and that nothing in the statute rebuts that presumption." *Kiobel II*, 569 U.S. at 185.

Because the ATS is not extraterritorial, then at the second step, we must ask whether this case involves "a domestic application of the statute, by looking to the statute's 'focus.'" *RJR Nabisco*, 136 S. Ct. at 2101. Defendants insist that any acts of assistance that took place in the United States are irrelevant because the extraterritoriality analysis should focus on the location where the principal offense took place or the location the injury occurred, rather than the location where the alleged aiding and abetting took place. We disagree.

The focus of the ATS is not limited to principal offenses. In *Mastafa v. Chevron Corp.*, the Second Circuit held that "the 'focus' of the ATS is on . . . conduct of the defendant which is alleged by plaintiff to be either a direct violation of the law of nations or . . . *conduct that constitutes aiding and abetting* another's violation of the law of nations." 770 F.3d at 185 (emphasis added); *see also Adhikari v. Kellogg Brown*

*& Root, Inc.*, 845 F.3d 184, 199 (5th Cir. 2017) (stating that aiding and abetting conduct comes within the focus of the ATS). We also hold that aiding and abetting comes within the ATS's focus on "tort[s] . . . committed in violation of the law of nations." 28 U.S.C. § 1350.

As part of the step two analysis, we then determine "whether there is any domestic conduct relevant to plaintiffs' claims under the ATS." *Adhikari*, 845 F.3d at 195. Under *RJR Nabisco*, "if the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application *even if other conduct occurred abroad*." *RJR Nabisco*, 136 S. Ct. at 2101 (emphasis added).

In *Mastafa*, the Second Circuit held that the following constituted "specific, domestic conduct": "Chevron's [Iraqi] oil purchases, financing of [Iraqi] oil purchases, and delivery of oil to another U.S. company, all within the United States, as well as the use of a New York escrow account and New York-based 'financing arrangements' to systematically enable illicit payments to the Saddam Hussein regime that allegedly facilitated that regime's violations of the law of nations." *Mastafa*, 770 F.3d at 195.

In *Licci by Licci v. Lebanese Canadian Bank, SAL*, the Second Circuit again held that the Lebanese Canadian Bank's ("LCB") "provision of wire transfers between Hezbollah accounts" through a United States bank constituted domestic conduct which rebutted the presumption against extraterritoriality. 834 F.3d 201, 214–15, 219 (2d Cir. 2016). There, LCB made "numerous New York-based payments and 'financing arrangements' conducted exclusively through a

New York bank account." *Id.* at 217 (citing *Mastafa*, 700 F.3d at 191).

Like in *Mastafa* and *Licci*, plaintiffs have alleged that defendants funded child slavery practices in the Ivory Coast. Specifically, plaintiffs allege that defendants provided "personal spending money to maintain the farmers' and/or the cooperatives' loyalty as an exclusive supplier." Because we are required to "draw all reasonable inferences in favor" of plaintiffs, *Mujica v. Airscan*, Inc., 771 F.3d 580, 589 (9th Cir. 2014), we infer that the personal spending money was outside the ordinary business contract and given with the purpose to maintain ongoing relations with the farms so that defendants could continue receiving cocoa at a price that would not be obtainable without employing child slave labor. Contrary to the district court's reasoning, providing personal spending money to maintain relationship above the contract price for cocoa is not ordinary business conduct, and is more akin to "kickbacks." *Mastafa*, 770 F.3d at 175. Defendants also had employees from their United States headquarters regularly inspect operations in the Ivory Coast and report back to the United States offices, where these financing decisions, or "financing arrangements," originated. *Licci by Licci*, 834 F.3d at 217 (citing *Mastafa*, 770 F.3d at 191). In sum, the allegations paint a picture of overseas slave labor that defendants perpetuated from headquarters in the United States. "This particular combination of conduct in the United States . . . is both specific and domestic." *Id.* at 191. We thus hold that foregoing narrow set of domestic conduct is relevant to the ATS's focus.

## III.    Aiding And Abetting Claim

Defendants invite us to rule in the alternative that plaintiffs have not sufficiently alleged the elements of aiding and abetting.  We think it unnecessary to reach that issue at this time.  As we have explained, *Jesner* changed the legal landscape on which plaintiffs constructed their case.  The operative complaint names several foreign corporations as defendants, and plaintiffs concede those defendants must be dismissed on remand.  The operative complaint also discusses defendants as if they are a single bloc—a problematic approach that plaintiffs would do well to avoid.  In light of *Jesner*, it is not possible on the current record to connect culpable conduct to defendants that may be sued under the ATS.

As we observed in *Nestle I*, "[i]t is common practice to allow plaintiffs to amend their pleadings to accommodate changes in the law, unless it is clear that amendment would be futile."  *See Nestle I*, 766 F.3d at 1028 (citations omitted).  We are mindful that this case has lingered for over a decade, and that delay does not serve the interests of any party.  But we cannot conclude that amendment would be futile, so we remand with instructions that plaintiffs be given an opportunity to amend their complaint.  On remand, plaintiffs must remove those defendants who are no longer amenable to suit under the ATS, and specify which potentially liable party is responsible for what culpable conduct.

### CONCLUSION

For the reasons set forth above, we **REVERSE** the district court and **REMAND** to allow plaintiffs to amend their complaint to specify whether aiding and abetting

conduct that took place in the United States is attributable to the domestic corporations in this case.

SHEA, District Judge:

I concur in the result.