JAMES E. GRAVES, JR.,
Circuit Judge, concurring in part, dissenting in part:
I.
I concur with the majority’s decision on Plaintiffs’ non-ATS claims. But this case squarely raises the question that Kiobel expressly left open: under what circumstances do a plaintiffs “claims touch and concern the territory of the United States ... with sufficient force to displace the presumption against extraterritorial application [of the ATS].” Kiobel, 133 S.Ct. at *208 1669. And on this question, I part ways with the majority, Plaintiffs here allege that a U.S. military contractor participated in a human trafficking scheme in order to fulfill its contract with the U.S. government to provide labor on a U.S. military base. There is much to support the conclusion that these claims “touch and concern” the United States. Therefore, I respectfully dissent.
A. Kiobel’s “Touch and Concern” Test
The majority adopts an unnecessarily restrictive view as to the meaning of Kio-bel’s “touch and concern” language by engaging in a formalistic application of the Morrison “focus” test. The majority’s application of the “focus” test belies the actual focus of the ATS and is inconsistent with the Supreme Court’s ATS jurisprudence. In the majority’s reading of the “touch and concern” test, only “domestic conduct ... sufficient to violate an international law norm that satisfies Sosa’s requirements of definiteness and acceptance among civilized nations” would permit extraterritorial application of the ATS. See Kiobel, 133 S.Ct. at 1670 (Alito, J., concurring). Rather than assessing what would displace the presumption against extraterritorial application of the ATS, id. at 1669, however, this test would eliminate the extraterritorial reach of the statute completely. If the alleged ATS violations must take place on domestic soil, the Kiobel majority’s statement regarding “touch and concern” would be meaningless. In my view, the defendant’s conduct here falls squarely within the focus of the ATS, and the claims, therefore, touch and concern the United States with sufficient force to displace the presumption against extraterritorial application.
The majority gives inordinate weight to RJR Nabisco in its application of Kiobel’s “touch and concern” test. Although I agree with the majority that RJR Nabisco sets forth a two-step framework for analyzing extraterritoriality issues and suggests that we should interpret Kiobel’s “touch and concern” language in light of the step-two “focus” inquiry, derived from Morrison v. Nat’l Australia Bank Ltd., 130 S.Ct. at 2883-88,1 do not agree that RJR Nabisco is somehow “determinative” of the issues in this case. RJR Nabisco, like Kiobel, stopped after step one. In RJR Nabisco, the Court determined that Section 1964(c) of the Racketeer Influenced and Corrupt Organizations Act (RICO) was not expressly extraterritorial and thus requires a civil RICO plaintiff to allege and prove a domestic injury. 136 S.Ct. at 2111. The plaintiffs, however, had filed a stipulation in the district court waiving their damages claims for domestic injuries. Therefore, as in Kiobel, all the “relevant conduct” took place outside the United States. RJR Nabisco no more illuminates the “focus” inquiry at step two than does Kiobel, and it leaves open the questions of how to interpret the focus of the ATS, what conduct is relevant to that focus, and how courts should proceed when there is potentially relevant conduct both within and outside the United States.
The majority then reasons that the “ATS ‘focus’ analysis” involves examining “the conduct alleged to constitute violations of the law of nations, and the location of that conduct” (quoting Mastafa, 770 F.3d at 185). I have no issue with this broad proposition; however, it is no simple matter to apply it to a case, such as this one, where the alleged conduct is comprised of several constituent actions that are part of an overall course of conduct constituting a violation of the law of nations. The particular violation alleged here, human trafficking, is a transnational crime that uses a global supply chain, which typically extends across multiple countries *209 and requires an extensive transnational network to succeed. The crime is accomplished through a dense system of recruiters, contractors, subcontractors, and parent corporations that cross cities, states, countries, and continents.[1] Each participant undertakes actions, such as recruitment, transportation, detention, and employment that form part of the overall criminal enterprise. “While some of these actions, in isolation, may not constitute a violation of the law of nations, they nevertheless constitute “relevant conduct” for purposes of the “focus” inquiry, if they play an integral role in the law of nations violation.
In addition, I am mindful that the “focus” inquiry centers on the conduct that constitutes the alleged law of nations violation. But surely the inquiry permits consideration of pertinent facts underlying the plaintiffs claim, such as the identity of the defendant, the nature of the defendant’s liability (direct or indirect), the type of violation alleged, and any significant connections the alleged violation has to the United States, above and beyond necessary allegations of relevant conduct occurring in the United States. While Morrison and RJR Nabisco are instructive in analyzing how the presumption against extraterritoriality should be applied to statutes generally, the Supreme Court’s ATS-specific precedents, Kiobel and Sosa v. Alvarez-Machain, 542 U.S. 692,124 S.Ct. 2739, 159 L.Ed.2d 718 (2004), must also guide our “focus” inquiry in the context of the ATS. Sosa and Kiobel demonstrate that such factors are central to the analysis of an ATS claim, and therefore they ought to inform our examination of the relevance of the alleged conduct, particularly any domestic conduct, to the focus of the ATS.
Notably absent from the majority opinion is any mention of the fact that KBR is a U.S. corporation, which Plaintiffs argue distinguishes this case from the “foreign-cubed” scenario in Kiobel. By omitting any mention of this fact, the majority presumably agrees with the Second Circuit (currently alone in this view) that a defendant’s U.S. citizenship has no relevance to the “focus” analysis. See Mastafa, 770 F.3d at 189. But Kiobel itself made clear that the citizenship of the defendant is not inconsequential. In the same paragraph describing the “touch and concern” exception to the presumption against extraterritoriality, the Kiobel majority opined that “[Corporations are often present in many countries, and it would reach too far to say that mere corporate presence suffices.” 133 S.Ct. at 1669. Some courts and commentators have taken this statement to mean that, although a corporation’s presence in the United States may be insufficient, standing alone, to displace the presumption against extraterritoriality, the fact of a defendant’s U.S. citizenship has some relevance to whether the claims touch and concern the United States. E.g., Doe v. Drummond, 782 F.3d 576, 594 (11th Cir. 2015) (“Kiobel implicitly supports that citizenship or corporate status may be relevant to whether a claim touches and concerns the territory of the United States, given that, after it set forth the test, it determined that ‘mere corporate presence’ was insufficient.”); Sarah H. Cleveland, After Kiobel, J. Int’l Crim. Just. (2014) 12 (3): 551 (explaining that “although mere corporate presence was not enough in Kiobel” the majority opinion left open whether “domicile or nationality of a defendant corporation or individual could be sufficient”).
Sosa also provides guidance as to the focus of the ATS. In Sosa, the Court ex *210 amined historical materials at the time of the ATS’s enactment to determine that in the 18th century, the law of nations comprised two principal elements: norms governing behavior of nation states toward each other and “a body of judge-made law regulating the conduct of individuals situated outside domestic boundaries and consequently carrying an international savor.” 542 U.S. at 714-15, 124 S.Ct. 2739. The law of nations required sovereigns to provide redress for law of nations violations in at least three circumstances: (1) when the violation occurred on a sovereign’s territory; (2) when a sovereign’s subject committed the violation-, and (3) when a perpetrator used the sovereign’s territory as a safe harbor to avoid punishment for having committed great wrongs. See Anthony J. Bellia Jr & Bradford R. Clark, The Alien Tort Statute and the Law of Nations, 78 U. Chi. L. Rev. 445, 471-76 (2011); see also Restatement (Third) of Foreign Relations Law § 402 (“Subject to [the reasonableness requirement of] § 403, a state has jurisdiction to prescribe law with respect to (1) (a) conduct that, wholly or in substantial part, takes place within its territory; (b) the status of persons, or interests in things, present within its territory; (c) conduct outside its territory that has or is intended to have substantial effect within its territory; (2) the activities, interests, status, or relations of its nationals outside as well as within its territory (emphasis added). Failure to provide such redress implicated the sovereign as an accomplice in the violation and risked reprisal from the nation suffering the wrong. See 4 William Blackstone, Commentaries on the Law of England 67-68 (1769); Emmerich de Vattel, Law of Nations, Book II, ch. 6, § 76 (1758) (a sovereign “ought not to suffer his subjects to molest the subjects of other states, or to do them an injury”). Consequently, U.S. citizens committing international law violations abroad had the potential to implicate the United States in diplomatic conflicts.
In sum, concerns about foreign relations were central to the ATS’s passage.[2] “The statute’s purpose was to address ‘violations of the law of nations, admitting of a judicial remedy and at the same time threatening serious consequences in international affairs.’ ” Kiobel, 133 S.Ct. at 1672 (Breyer, J., concurring) (quoting Sosa, 542 U.S. at 715, 124 S.Ct. 2739). Prior to the enactment of the ATS, Congress was frustrated by the federal government’s incapacity to vindicate rights under the law of nations. Sosa, 542 U.S. at 716-17, 124 S.Ct. 2739. Congress enacted the ATS as an important federal enforcement mechanism intended to enable the United States as a fledgling nation to meet its obligations under the law of nations and avoid diplomatic strife with other nation states.
Given the proliferation of international agreements condemning human trafficking and forced labor, surely these foreign policy concerns are no less pertinent in the present day. Among several international *211 accords concerning trafficking, the United States has signed and ratified a treaty that asks signatories to hold their citizens responsible for transnational trafficking.[3] Human trafficking has been condemned as a modern-day form of slavery. The slave trader, like the pirate, is “hostis humani generis, an enemy of all mankind.” See Sosa, 542 U.S. at 732,124 S.Ct. 2739 (quoting Filartiga v. Pena-Irala, 630 F.2d 876, 890 (2d Cir. 1980)).[4] “And just as a nation that harbored pirates provoked the concern of other nations in past centuries, so harboring ‘common enemies of all mankind’ provokes similar concerns today.” Kiobel, 133 S.Ct. at 1673 (Breyer, J., concurring) (internal reference omitted).
These foreign policy concerns are particularly heightened where, as here, the defendant’s conduct directly implicates the United States and its military. KBR was one of the largest U.S. military contractors operating in Iraq. While KBR was allegedly exploiting trafficked labor at Al Asad, the U.S. government and military were engaged in an aggressive anti-trafficking campaign. “Contractors provide crucial support for the U.S. military and are perceived internationally as an extension of the military.”[5] Congress repeatedly expressed concern that failure to hold U.S. military contractors accountable for human trafficking overseas undermines U.S. foreign policy.
This case substantially implicates the interests of the United States, both domestically and abroad. While these considerable connections to the United States may not be dispositive to the extraterritoriality inquiry, they are of critical importance to analyzing the focus of the ATS. At a minimum, they counsel a hard look at any domestic conduct alleged on the part of the defendant. It simply contravenes the focus of the ATS to disregard these facts entirely.
B. Application of the “Touch and Concern” Test to the Summary Judgment Record
Properly applying the “touch and concern” test here leads to the conclusion that Plaintiffs have adduced sufficient evidence of domestic conduct relevant to the alleged law of nations violation to displace the presumption against extraterritorial application of the ATS. Plaintiffs contend that the district court’s analysis of the evidence in the summary judgment record was improper. I agree.
Plaintiffs allege a number of actions by KBR occurring in the United States that form part of the alleged law of nations violations on which their ATS claims are based. Plaintiffs allege that KBR is directly liable for the torts of human trafficking and forced labor. In support of their allegations, Plaintiffs submitted evidence of U.S.-based conduct by KBR that evinced *212 their participation in a transnational trafficking scheme that ensnared Plaintiffs. Specifically, Plaintiffs offered that KBR transferred payments to the labor broker, Daoud, from the United States, using New York banks. These payments were made pursuant to KBR’s subcontract with Daoud, the Master Agreement of which had been executed by a U.S.-based KBR employee located in Houston. Daoud was the only approved source for obtaining third-country national (“TCN”) temporary laborers at the Al Asad Airbase. The majority states that Plaintiffs “failed to connect the alleged international law violations to these payments or demonstrate how such payments — by themselves — demonstrate that KBR’s U.S.-based employees actually engaged in trafficking the Deceased or forcing Plaintiff Gurung to work on its base.” But no inferential leap is required to find payment for trafficked labor to be an action critical to the operation of a global trafficking scheme. This is domestic conduct relevant to the alleged law of nations violation.
Plaintiffs have also offered evidence raising the inference that U.S.-based employees knew about the human rights abuses by Daoud and KBR overseas while KBR continued to use Daoud as a supplier of cheap labor. On this point, the majority summarily adopts the district court’s conclusion that Plaintiffs’ evidence of KBR’s knowledge “only implicated KBR’s operations overseas.” Plaintiffs assert, however, that they did present evidence of knowledge implicating KBR’s U.S. operations. But the district court improperly weighed this evidence against other evidence and drew conflicting inferences therefrom. See Haverda v. Hays Cty., 723 F.3d 586, 591 (5th Cir. 2013) (“A court considering a motion for summary judgment must ... draw all reasonable inferences in favor of the nonmoving party and may not make credibility determinations or weigh the evidence. In addition, a court must disregard all evidence favorable to the moving party that the jury is not required to believe.” (internal quotations and citations omitted)).
In a footnote, the district court noted that Plaintiffs’ “most damning piece of evidence” was a decision by a U.S.-based employee to terminate a consultant working for KBR at Al Asad after he complained regarding the treatment of third-country nationals employed by Daoud, including, quite pertinently, Plaintiffs in this suit. The district court, however, discounted this evidence of “U.S.-based complicity” because the U.S. employee who decided to “pull” the consultant from Al Asad simultaneously requested an independent investigation into the consultant’s complaints. Moreover, the district court made no mention of other evidence that two KBR employees from Houston, including an investigator, flew to the Middle East to threaten the consultant with termination following the escalation of his complaints.
And the record demonstrates that this was not the only complaint of abuses at A1 Asad that made its way to the United States. The district court noted but assigned no significance to evidence that “complaints from a U.S. Marine regarding ill treatment of third-country nationals at Al Asad were forwarded through KBR’s U.S.-based employees to on-site base staff.” The email message, titled “Problem with Halliburton Subcontractor in Iraq,” was forwarded with the comment, “If true, fixe [sic] it, if not, ignore it.”
Furthermore, these specific incidents occurred against the backdrop of media reports and growing international concern regarding potential human trafficking and other labor abuses by U.S. military contractors in Iraq, as well as an aggressive anti-trafficking campaign by the U.S. mili *213 tary and agencies including the Department of Defense, targeted at U.S. military contractors.[6] It defíes reason to conclude that all KBR employees in the U.S. were oblivious to these controversies. But Plaintiffs’ theory does not rely on inference alone.
Plaintiffs offered evidence that KBR’s U.S.-based employees managed KBR’s responses to press and governmental inquiries into human trafficking. For example, in response to a May 2004 New York Times inquiry regarding human trafficking, a U.S.-based employee wrote to his colleagues: “[T]he press continues to dig up these stories and Houston insists on answering each one.”
U.S.-based employees also were involved in fielding questions from Time Magazine’s New Delhi Bureau after the Indian government in May 2004 requested clarification from the U.S. government concerning reports that Indian nationals working at A1 Asad wished to return home but “were being compelled to continue to remain in Iraq against their will.” The Indian Ambassador had lodged a formal complaint specifically mentioning Daoud’s delay in repatriating third-country nationals who wished to return home and KBR’s “abdication of responsibility.” Time’s questions were forwarded in the KBR email chain along with suggested responses. Some examples include:
[H]ow much responsibility does Halliburton accept for what essentially amounts to human trafficking by your subcontractors? Will you be investigating? [LJegal needs to address ,. but we should probably make a general statement that we do not know that these men were employed by any KBR subcontractor, that KBR is not the only contractor in Iraq....
What is your response to the Indian workers’ claims that they were “slaves”? I’d probably say something like: We cannot respond to this. This issue needs to be address [sic] to the firm that employed them.
In July 2004, the Washington Post published an article describing KBR’s frequent use of debt bondage in Iraq, after which the Department of Defense immediately implemented measures requiring contractors to meet minimum compensation levels, create individual employment contracts, and establish other procedures to eliminate trafficking and forced labor. Despite such high-profile inquiries and governmental pressure, KBR continued to employ Daoud as its labor broker for staffing needs at Al Asad.
At a minimum, the evidence tends to show that some U.S.-based employees knew about the allegations of abuses embroiling KBR’s overseas operations. Further, drawing all reasonable inferences in Plaintiffs’ favor, a jury could conclude on this record that U.S. employees failed to properly investigate these accusations of human rights abuses by KBR overseas and either -willfully ignored evidence of such abuses or actively sought to cover up the misconduct. Cf Al Shimari, 758 F.3d at 522, 531 (finding this type of domestic *214 conduct sufficient to displace the presumption against extraterritoriality). The district court erred in concluding that this evidence failed to raise a genuine dispute of material fact sufficient to overcome KBR’s motion for summary judgment.[7]
II.
The majority also affirms the district court’s decision to deny Plaintiffs leave to amend on futility grounds. I disagree that Plaintiffs’ proposed amendments would necessarily be futile. First, there is already evidence of relevant domestic conduct in the record, which was prepared well before discovery closed. Allowing leave to amend for the parties to conduct further discovery targeted at domestic conduct sufficient to satisfy Kiobel’s “touch and concern” test would be reasonable and not clearly an exercise of futility. Second, Plaintiffs’ alternative grounds for amendment — to allege a theory of aiding and abetting in the United States — would state a plausible claim for relief even under the majority’s restrictive interpretation of the “touch and concern” test; consequently, amendment would not have been futile.
A. Leave to Amend for Further Factual Development
Rule 15 governs motions to amend made before trial and provides that “[t]he court should freely give leave when justice so requires.” Thomas v. Chevron U.S.A., Inc., 832 F.3d 586, 590 (5th Cir. 2016) (quoting Fed. R. Civ. P. 15(a)(2)). When the denial of leave to amend is based on grounds of futility, we apply the 12(b)(6) standard to review the sufficiency of the complaint. If the allegations are “ ‘enough to raise a right to relief above the speculative level’ and [the] claim for relief is plausible on its face, ... amendment would not have been futile.” Id. at 593 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)) (additional citations omitted).
The district court stated that Plaintiffs’ leave to amend their complaint in light of Kiobel would be futile because the court’s “conclusion that the relevant conduct by KBR and Daoud occurred outside of the territory of the United States” was based on the summary judgment record, and not on the pleadings. The district court’s conclusion, however, is based on its erroneous determination that evidence of domestic conduct in the summary judgment record was immaterial. If the district court had properly deemed this evidence material, it could not have concluded that Plaintiffs’ allegations, accepted as true, “lacked sufficient factual matter” to “state a claim to relief that is plausible on its face.” Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal quotation marks and citation omitted).
Moreover, Plaintiffs’ counsel clarified at oral argument that the parties were in the middle of discovery when the Kiobel decision issued. All discovery up to that point had been taken prior to Kiobel and therefore was not focused on U.S.-based conduct. The entire summary judgment record was prepared prior to Kiobel, on the basis of which the district court, without a *215 hearing, decided that Kiobel mandated dismissal of Plaintiffs’ ATS claims.
Plaintiffs argue that they should have been permitted to amend their complaint to allege that U.S.-based managers had control and supervision over the labor flow and knew about the trafficking and did nothing to stop it. The district court had already found that Plaintiffs presented sufficient evidence that “KBR had the authority to exercise control, and did exercise said control, over Daoud’s recruitment and supply of laborers.” Specifically, Plaintiffs sought to amend their complaint to allege that:
KBR managers in the United States knew of the use of labor brokers and their practices, received reports of wrongdoing, at all times had power to take corrective action, but declined to do so; that managers in the United States were involved when there was conflict or controversy concerning KBR’s operations in Iraq, including incidents regarding subcontractors and/or third country nationals, and that KBR managers in the United States had ultimate authority over such issues.
As discussed above, it is my view that these actions, if borne out by the evidence, constitute “relevant conduct” to the alleged international law violations for which Plaintiffs assert KBR should be held directly hable, and that this relevant conduct is sufficient to satisfy Kiobel’s “touch and concern” test. Plaintiffs have already pointed to evidence in the record tending to support these contentions. It is plausible that further reasonable discovery, if permitted, would uncover more evidence of a similar nature. Accordingly, Plaintiffs’ proposed allegations to satisfy Kiobel are “enough to raise a right to relief above the speculative level,” Twombly, 550 U.S. at 555, 127 S.Ct. 1955, and would not have been futile.
B. Leave to Amend to Allege Aiding and Abetting in the United States
Even accepting the majority’s limited reading of Kiobel’s “touch and concern” language, it is not apparent that amendment would have been futile. In the alternative, Plaintiffs sought to amend to allege aiding and abetting in the United States in light of Kiobel. Concluding that Plaintiffs’ theory of indirect liability would have been futile, the majority states, “Plaintiffs argue they would be able to allege facts that satisfy Al Shimari, but Al Shimari is not the test_[0]ur approach requires analysis of the conduct relevant to the statute’s ‘focus.’ See Morrison, 561 U.S. at 266, 130 S.Ct. 2869.” But Plaintiffs’ aiding and abetting claim does not rely on Al Shimari. And this is a plausible claim even under the majority’s restrictive reading of Kiobel.
Plaintiffs assert that they should have been permitted to add allegations of aiding and abetting in the United States because post-Kiobel “[cjourts have uniformly concluded that when the U.S.-based conduct itself constitutes a violation of the ATS, such as aiding and abetting a violation from the United States, the touch and concern test is satisfied.”
As support, Plaintiffs cite the Second Circuit’s decision in Mastafa, 770 F.3d at 185, whose approach to the “touch and concern” test the majority purports to follow. In Mastafa, the Second Circuit held that “relevant conduct” for purposes of the “touch and concern” test is “the conduct of the defendant which is alleged by plaintiff to be either a direct violation of the law of nations or ... conduct that constitutes aiding and abetting another’s violation of the law of nations.” Id. In other words, “relevant conduct” is conduct that is itself “sufficient to violate an international law norm [satisfying] Sosa’s requirements of definiteness and acceptance among civilized *216 nations.” Kiobel, 133 S.Ct. at 1670 (Alito, J., concurring). In Mastafa, there were allegations that the defendants engaged in financial transactions in the United States, some through a New York bank account, which indirectly financed the alleged international law violations — torture by agents of the Saddam Hussein regime in Iraq. 770 F.3d at 191. The Second Circuit found these transactions to be “non-conclusory conduct that appears to ‘touch and concern’ the United States with sufficient force to displace the presumption against extraterritoriality^]” Id. (alterations omitted). Nevertheless, because the Second Circuit had adopted a purposeful mens rea standard for aiding and abetting under the ATS, the Mastafa court determined that the conduct would fall short of that standard and could not be relied upon to displace the presumption. Id. at 192-93.
Plaintiffs here have pled and offered evidence of similar U.S.-based transactions, specifically, KBR’s payments to Daoud from the United States, using New York banks. Therefore, if Plaintiffs are able to offer evidence satisfying the mens rea standard for aiding and abetting, this conduct would appear to satisfy even the narrow “touch and concern” test.
Unlike the Second Circuit, our Court has not settled on the proper mens rea standard for aiding and abetting liability under the ATS. A split exists among other circuits that have reached the issue as to whether the standard is purpose or a lesser standard akin to knowledge. Compare Presbyterian Church of Sudan v. Talisman Energy, Inc., 582 F.3d 244, 259 (2d Cir. 2009) (purpose); Aziz v. Alcolac, Inc., 658 F.3d 388, 398 (4th Cir. 2011) (following Talisman in adopting purpose standard) with Doe v. Exxon Mobil Corp., 654 F.3d 11, 39 (D.C. Cir. 2011), vacated, 527 Fed. Appx. 7 (D.C. Cir. 2013) (knowledge). In Doe I v. Nestle USA Inc., 766 F.3d 1013, 1024 (9th Cir. 2014), the Ninth Circuit declined to decide the mens rea standard, finding that the plaintiffs’ allegations would satisfy either standard. It is also unnecessary to reach the issue here because Plaintiffs’ proposed allegations would satisfy even the more stringent purpose standard.
The Ninth Circuit’s analysis in Doe I is instructive. In Doe I, the plaintiffs were former child slaves who were forced to harvest cocoa on the Ivory Coast. 766 F.3d at 1017. The defendants maintained and protected a steady supply of cocoa through buyer/seller relationships with Ivorian cocoa farmers. Id. By virtue of their economic leverage, they effectively controlled the production of Ivorian cocoa. Id. The complaint alleged that they economically bene-fitted from the use of child slavery, could have stopped or limited the use of child slave labor by their suppliers, did not use their control to do so, but instead offered support that facilitated it. Id. at 1025. The Ninth Circuit held that these allegations supported the inference that defendants “acted with the purpose to facilitate child slavery.” Id. at 1024.
The Doe I court was careful to note that merely doing business with the suppliers would not satisfy the purpose standard. The court found, however, that the defendants’ alleged plan to benefit from the use of child slave labor as a means of reducing their production costs distinguished the case from other ATS decisions where the purpose standard was not met. Id. at 1024-25. In those cases, the defendants profited by doing business with known human rights violators, but were not alleged to have benefited in any way from the underlying human rights violations. Id. at 1024 (discussing Talisman Energy, Inc., 582 F.3d at 262-64 and Aziz, 658 F.3d at 394, 401). In contrast, the Doe I defendants allegedly received a direct benefit *217 from the commission of the international law violation, which bolstered the allegation that they acted with the purpose to support it. Id.
The allegations here also support the inference that Defendants acted with the purpose of supporting trafficking and forced labor. Plaintiffs allege that KBR “willfully and purposefully formed an enterprise with the goal of procuring cheap labor and increasing profits.” Plaintiffs provided evidence that KBR both knew about Daoud’s recruitment practices and had the authority to exercise control over them, and did exercise said control. KBR exercised an even greater level of control over the labor flow than the defendants did in Doe I. Plaintiffs propose to allege further that U.S.-based managers had control and supervision of the labor flow, knew about the trafficking, and did nothing to stop it. They have already presented evidence that U.S.-based managers received multiple complaints of misconduct, including one concerning these Plaintiffs, and made a decision to investigate and terminate the employee who complained. Courts have found the place of decision-making significant to the relevant conduct inquiry when plaintiffs allege indirect liability. See, e.g., Drummond, 782 F.3d at 597 (relevant conduct inquiry extends to place of decision-making as opposed to site of actual violation); Doe v. Exxon Mobil Corp., No. CV 01-1357 (RCL), 2015 WL 5042118, at *14 (D.D.C. July 6, 2015) (“Decisions to provide assistance that will have a substantial effect on a violation of customary international law are part of a course of conduct that gives rise to a claim for aiding and abetting under the ATS. Therefore, the site of these decisions is relevant to the Court’s application of the presumption against extraterritoriality and the touch and concern test.”).
Similar to the allegations in Doe I, Plaintiffs allege that KBR received a direct benefit from the commission of the international law violations. Plaintiffs would allege various actions in the United States that directly facilitated the violations, including payments to the labor supplier, decisions that perpetuated the wrongdoing, and efforts to conceal it. These allegations would support the inference that Defendants acted with the purpose of facilitating trafficking and forced labor. Plaintiffs’ proposed allegations state a plausible claim for aiding and abetting in the United States. It was error for the district court to deny leave to amend as futile.
Accordingly, I respectfully dissent in part.

. See, e.g., U.S. Department of State, Trafficking in Persons Report (July 2015), at 13-18, available at, https://www.state.gov/documents/ organization/245365.pdf.

. The majority nevertheless states that "foreign-policy consequences and the international norms underlying the claim are immaterial to our analysis.” In support, the majority cites RJR Nabisco's statement that a presumption about a statute’s meaning applies "across the board, ‘regardless of whether there is a risk of conflict between the American statute and a foreign law,’ ” 136 S.Ct. at 2100 (quoting Morrison, 561 U.S. at 261, 130 S.Ct. 2869). RJR Nabisco, however, was referring, not to the "focus” inquiry at step two of the extraterritoriality analysis, but to step one, when a court must determine whether the presumption applies to the statute at all. Concerns that were central to Congress's purpose in enacting the statute, such as the foreign-policy implications of a defendant’s conduct with respect to the ATS, are by definition material to the step two analysis of the statute’s focus and of whether the conduct at issue is relevant to that focus.

. See Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, Supplementing the United Nations Convention Against Transnational Organized Crime, Nov. 15, 2000, 2237 U.N.T.S. 319, available at https://treaties.un.org/Pages/ ViewDetails.aspx?src=IND&mtdsg_no=XVI-II-12-a& chapter=18& clang=_en.

. Notably, an interpretation of “touch and concern” that requires conduct constituting a violation of the law of nations within the United States fails to address piracy, which the Kiobel Court deemed to fall within the ambit of ATS jurisdiction, despite its occurrence on the high seas. 133 S.Ct. at 1667.

,Amici curiae retired U.S. military officers explain that during the events at issue, the United States retained both exclusive control of the Al Asad Airbase and practical control over Iraqi territory. Although this may not be sufficient to render Al Asad de facto territory of the United States, it most certainly implicates the United States in KBR's conduct at Al Asad.

. For example, in 2002, President Bush announced that "[t]he United States hereby adopts a ‘zero tolerance’ policy regarding U.S. Government employees and contractor personnel representing the United States abroad who engage in trafficking in persons,” President George W. Bush, National Security Presidential Directive-22 (Dec. 16, 2002), available at http://www.combat-trafficking. army.mil/documents/policy/NSPD-22.pdf). The directive required departments and agencies to investigate and punish, as appropriate, those personnel who engage in trafficking. Id. at 4. Pursuant to this policy, the Department of Defense implemented specific procedures to combat trafficking on military bases, including vigorous anti-trafficking investigations.

. The majority states that “Plaintiffs effectively concede” that they failed to introduce any evidence indicating that KBR’s U.S.based employees were aware of Daoud’s recruitment practices or worked to prevent those practices from coming to light or prevent their discontinuance because Plaintiffs argue that they “ 'would have specifically alleged such conduct by U.S.-based KBR employees’ had they been permitted to amend their complaint.” In light of the aforementioned evidence in the record, I fail to see how Plaintiffs’ request for leave to amend their complaint to specifically allege these facts functions as a concession that evidence in support of these facts does not exist.